**STATE of Tennessee, Appellant,**

v.

**Joseph Paul FRANKLIN, alias James Clayton Vaughan, Appellee.**

Supreme Court of Tennessee, at Knoxville.

July 21, 1986.

W.J. Michael Cody, Atty. Gen. and Reporter, Gordon W. Smith, Asst. Atty. Gen., Nashville, for appellant.

Jerry H. Summers, Hugh J. Moore, Jr., Chattanooga, for appellee.

## OPINION

DROWOTA, Justice.

This case presents an unusual issue. Defendant, Joseph Paul Franklin, although represented by counsel at every stage of his prosecution, spontaneously requested and was permitted by the trial court to make a closing statement to the jury along with the arguments of his two court-appointed attorneys.

Defendant was indicted on March 7, 1984, by the Hamilton County Grand Jury on charges of malicious injury to structures with explosives, T.C.A. § 39-3-703(a) (bombing), and unauthorized possession of explosives, T.C.A. § 39-3-706. Convicted by a jury, Defendant was sentenced to 15 to 21 years for bombing and to 6 to 10 years for possession of explosives, to be served consecutively. The Court of Criminal Appeals held that Defendant had not knowingly and intelligently waived his right to the assistance of counsel and that the trial court had abused its discretion in allowing Defendant to participate in closing argument, reversing and remanding the case for a new trial. Having granted the State's application for permission to appeal pursuant to Rule 11, T.R.A.P., we now reverse the Court of Criminal Appeals and reinstate the judgment of the trial court. From the beginning, we emphasize the exceptional nature of this case.

## I.

On July 29, 1977, just before 9:00 p.m., the Beth Shalom Synagogue in Chattanooga was completely destroyed in an explosion. Explosives had been placed in the center of the building by way of a crawl space beneath it and had been detonated by an electrical extension cord that ran approximately two hundred feet from the synagogue to a nearby motel, where it had been plugged into an outside electrical socket to ignite the charge. During the investigation of the explosion, investigators noted the strong odor of exploded dynamite.

While all leads in the investigation had been pursued without success, Defendant did not become a suspect until after the Federal Bureau of Alcohol, Tobacco and Firearms (BATF) had closed the case in November, 1979. Almost five years later, the Chattanooga Police Department received information that Defendant had made statements regarding this synagogue bombing; the Department then contacted the BATF investigator previously assigned to the case. At the time, Defendant was incarcerated in the Federal Penitentiary at Marion, Illinois, which is a maximum security prison, serving four consecutive life sentences for murder. On February 29, 1984, at Marion, in the presence of a BATF agent and a Chattanooga Police Officer, Defendant, having waived his *Miranda* rights, voluntarily confessed to the bombing and possession of explosives for which he was convicted in this case. Defendant stated that he had intended for the explosion to be timed with an evening service when the synagogue would have had people in it. Fortunately, the service had ended early that evening and only the building was destroyed without loss of life or injuries. Defendant openly advocates racist political and religious beliefs, which apparently motivated this bombing, and has committed a number of crimes in conformity with these beliefs.[1] While incarcerated at Marion, Defendant was on one occasion attacked and stabbed fifteen or sixteen times by other inmates; he was then isolated from the population in a special housing unit.

Proof at trial revealed that Defendant had obtained the explosives (dynamite and Tovex) by using an alias, James Clayton Vaughan, to purchase dynamite from a Chattanooga supply store in late June of 1977, and the Tovex from a Charleston, West Virginia, supplier in early July, 1977. Defendant's fingerprints on the BATF Explosives Transaction Records of these sales were compared to Defendant's known prints and identified by an expert. Additionally, a handwriting analysis was made of Defendant's signature of his alias on these forms; these signatures were determined to be written by Defendant.

■ Trial of this case was held from July 10 to 12, 1984.[2] Two prominent attorneys were appointed by the Court to represent the Defendant. The defense strategy was to show that Defendant had confessed to numerous crimes throughout the country to obtain a transfer from Marion, where he lived with restricted privileges

1. Defendant has roamed the United States committing racially motivated murders in Utah, planting a bomb in the house of an Israeli lobbyist in Maryland, and robbing up to fifteen banks to support his activities. He claims to have bombed the Socialist Workers Party Headquarters in Atlanta as well. To some extent, he has been associated at various times with the American Nazi Party and the United Klans of America. Among others, he condemns communists, Jewish people, and interracial contact with blacks. He believes that a massive Jewish conspiracy grips the Federal Government.

2. Although we denied Defendant's application for permission to appeal on the issue of whether the statute of limitations applied, we note that T.C.A. § 40–2–101(c) [now codified as § 40–2–101(d) ] was tolled by the facts that Defendant was not usually and publicly resident in Tennessee during the four year period of the statute, as he only intermittently visited this State following the 1977 bombing—and then often using one or more aliases, and, while he was in federal prisons since about 1980, no evidence pointed to him as the offender until he confessed in 1984. *See* T.C.A. § 40–2–103. *See also, e.g., State v. Ansell*, 36 Wash.App. 492, 675 P.2d 614 (1984); *Grayer v. State*, 234 Ark. 548, 353 S.W.2d 148 (1962); *People v. Carman*, 385 Ill. 23, 52 N.E.2d 197 (1943).

because his life was threatened. The defense was highly unusual in that it informed the jury of Defendant's political and religious beliefs, and of his prior offenses as well as of crimes to which he had only confessed but for which he had not yet been tried or convicted. The tactical problem was to get the jury to believe that Defendant was lying when he confessed to the details of the bombing in Chattanooga as part of his ulterior motive to get out of Marion. This defense was stressed on voir dire and in the opening statements of Defendant's counsel. The prosecution strategy, also somewhat unusual, was to corroborate the confession carefully to insure the jury would find Defendant credible. Both sides recognized the unique positions in which their strategies placed them. In their opening statements, the State's attorneys noted that this was a different type of case in which the defense would ask the jury to believe that Defendant, a well-read individual garnered the details of the bombing from various media accounts but that he didn't actually commit the crime. The State repeatedly referred to the Defendant's personality and radical beliefs. Further, during a subsequent jury-out conference regarding excision of portions of Defendant's confession, the trial court noted that "[t]his is an unusual situation in that the defendant has put before the jury the fact that he has been convicted in these other cases and that he has been charged with crimes all around the country."

Over the course of the trial, the defense questioned the State's witnesses regarding the extent of media coverage and the details of the bombing (to demonstrate contradictions between Defendant's confession and the actual events). The defense attempted to show that the circumstantial evidence that pointed to Defendant was insufficient without the confession, which was to be discredited by revealing Defendant's ulterior motive and a superficial familiarity with the facts surrounding the bombing. The defense never actively contested the charge on illegal possession of explosives. Another aspect of the defense effort to discredit the confession was to show that the investigating officers led Defendant through many of the details of the bombing to establish corroboration for his confession.

At two points in the trial, Defendant chose to absent himself from the courtroom and, on the first occasion, he executed a written waiver of his right to attend his trial, authorizing his court-appointed counsel to defend him "as they see fit during [his] absence on the morning of July 11, 1984," but reserving his right to be present during any other stage of the trial "if [he should] wish to attend." The trial court instructed the jury that Defendant's absence was the result of the exercise of his constitutional right to be present or absent and that his absence could not "be considered for any purpose against him, nor [could] any inference be drawn from the fact."

The only witness called for the defense was John M. Cowart, the Lawrenceville, Georgia, police officer who had been assigned to investigate the ambush shooting of Larry Flynt, the publisher of *Hustler* magazine. In Defendant's confession to this bombing in February, 1984, he specifically denied being involved in the shooting of Larry Flynt. Officer Cowart had previously spoken to Defendant, who was at Marion, in December of 1983, regarding the Flynt case. At that time, Defendant expressed his desire to be removed from Marion and stated that he would cooperate with Officer Cowart if the officer would try to help "get [him] out of here." Defendant then confessed to the Larry Flynt shooting. In this statement to Officer Cowart, Defendant remarked, "Ill tell you I'm getting to a point now where I'd say anything just to get out of here for awhile." Officer Cowart was also told by Defendant that he had bombed the Chattanooga synagogue and the house of an Israeli lobbyist in the Washington, D.C., area. During the direct examination of Officer Cowart by Defendant's counsel, not only were some of the general conditions at Marion brought out, but defense counsel also specifically inquired about Defendant's stabbing inci-

dent, asking whether they had discussed an alleged attempt by Defendant's attackers to assault him sexually. At this point in the examination, Defendant reacted, denying that any such attempt had been made. The terse exchange between Defendant and his counsel is preserved on the record; defense counsel withdrew the question when Defendant adamantly denied it. The Defendant himself did not testify on his own behalf.

The following day, July 12, 1984, closing arguments were made, first by the State, which emphasized Defendant's political and religious beliefs as his motive and the corroboration of the confession, asking the jury to find it credible. Next, Defendant's counsel reminded the jury that Defendant was not on trial for his beliefs and that Defendant deserved a fair trial only for the crimes charged. The defense continued its strategy of attempting to show that Defendant confessed to the bombing as a part of his scheme to obtain a transfer from Marion. During a brief jury-out conference following the closing argument of one of Defendant's attorneys, the trial court stated to Defendant's counsel that it had "come to [his] attention that [Defendant] would like to make a closing statement to the jury." Over defense counsel's objections, the trial court ruled that Defendant had the right to make such a statement and that Defendant would be "representing himself before the jury...." When the jury returned, the trial court gave the following instruction:

> "THE COURT: Members of the jury, Mr. Franklin has requested that he be allowed to represent himself as far as a closing statement to the jury. I caution you that his statement is a statement. It is not testimony. It is not sworn testimony. He is merely acting as his own attorney, which he has the right to do, in making a closing statement to you. It is not evidence."

Defendant then began his statement, remarking to the jury that it was unrehearsed and that he had "just recently decided to make this statement, within the

hour." After a preliminary comment regarding the stabbing incident at Marion, Defendant stated to the jury, "I want to make your job a little easier here, as far as your deliberations go. You know, I admit to you I bombed the synagogue. You know, I did it. You know, and I'll tell it to anybody around. It was a synagogue of Satan." His argument continued, explaining why he planted the bomb and basing his position on his interpretation of the Bible, particularly quoting the Book of Revelations. He expounded on the Jewish conspiracy in which he believes, claiming that "[t]hey control the American Government. They control the news media. Control all different branches of the U.S. Government. The communist nations are all controlled by Jews, and all the western democracies are controlled by Jews." According to Defendant, the "Kahzar Jews" (as he refers to them) "are trying to destroy [the white race] through race mixing and through communism." Apparently, Defendant took this opportunity to speak not only to offer his theory of a Jewish conspiracy to justify his acts but to conclude with an appeal "for everybody to—the only way that the white race can be saved now and get out of the trouble that they're in today, is for everybody to fast and get on their knees and praise the Lord. And I just hope that everybody here does that and accepts Jesus Christ as their personal savior."

Following the Defendant's closing statement, the other defense counsel, Jerry Summers, made his closing argument. Mr. Summers stressed that, given Defendant's beliefs, affording Defendant a fair trial was of paramount importance; he asked that the jury "put aside any feelings that [they] have in regard to whether [they] agree[d] or disagree[d] with him ... and ... make [the] decision on the facts of this case." He continued: "I don't think you're ever [going to] see any two lawyers in the position probably ... where really we're asking you to not believe our client and the D.A.'s asking you to believe him." He argued that absent Defendant's confession, he would never have been a suspect in the

bombing, and that, given his already substantial prison sentences, Defendant had nothing to lose in confessing; thus, understanding Defendant's ulterior motive for the confession was crucial to determining the credibility of the confession. Mr. Summers also noted that Defendant had used the trial as a forum to express his political and religious views, which was part of what Defendant wanted from his trial. After Mr. Summers finished but before the District Attorney gave his final argument, the Defendant left the courtroom for the second time at his own request.

In the State's final argument, the District Attorney stated that he had "thought [this] would be kind of a low-key trial, and [he] apologize[d] for misinterpreting what actually became quite dramatic." Continuing, he argued that Defendant did indeed want to use the trial as an opportunity to publicize his political and religious beliefs. Nevertheless, after arguing the evidence, the District Attorney then emphasized that, despite Defendant's desire to get out of Marion, the State had not promised him anything at any time to obtain his confession. Remarking that Defendant was a credible person, he added that "[t]he motive for being here in this trial is the same motive for the explosion of the synagogue.... He wants attention for his attitudes and his feelings, his warped, demented thinking about races of people."

At the hearing on the motion for a new trial, defense counsel argued that Defendant acted against their advice in making the statement to the jury and that the trial court had erred in permitting him to act as his own counsel. Counsel for Defendant stated that "in this situation ... Mr. Franklin had never until at that point of the trial ... requested that he be allowed to serve as his own counsel." The trial court, in denying the motion for a new trial, stressed the circumstances of this trial, stating that:

"As you said, this is a novel situation. This is where a defendant insisted and the Court allowed him to be his own attorney. And the reason the contrary is not true is that the defendant has a constitutional right to be his own lawyer. So if you give him that right then it's not error then for—I don't see how the Court can be in error if he allows him to be his own attorney. All I'm doing is allowing him to exercise his constitutional right to be his own lawyer. I cannot force an attorney upon him. I do have a right I guess to protect a defendant from himself. But when you observe the defendant and you realize the defendant is doing what he wants to do, that the defendant is sane, that the defendant is making a knowing decision on his part, then I have no right really to cut off his constitutional right. And having observed Mr. Franklin several days in the course of the trial, I realized that he was capable of representing himself. He was conducting the trial the way he wanted the trial to be conducted. And, of course, it's obvious that he did not agree with the line of defense that his attorneys were setting out. But I think he had that right to get up and argue the case the way he wanted to."

The trial court went on to clarify that the only apparent disagreement between Defendant and his counsel had involved the question to Officer Cowart suggesting a sexual assault on Defendant while he was at Marion. The court then articulated several of his observations regarding Defendant's conduct at trial; Defendant's independent decisions to absent himself periodically from the courtroom; his request before trial that his manacles be removed; and his reading the Bible throughout trial without losing track of the proceedings.

From the above summary of this trial, the record as a whole demonstrates that this case was tried in an atypical manner. The trial strategies of both the defense and prosecution, Defendant's own conduct throughout trial, and the very nature of and motivation for the crimes involved combined to create a delicate trial atmosphere.

## II.

In its opinion, the Court of Criminal Appeals, relying on *Faretta v. California*,

422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), *State v. Northington,* 667 S.W.2d 57 (Tenn.1984), and Rule 44(a), T.R.Crim.P., found that the trial court had not ascertained the validity of Defendant's waiver of his right to counsel. Citing *State v. Burkhart,* 541 S.W.2d 365 (Tenn.1976), the Court of Criminal Appeals also observed that while a defendant has an alternative right to counsel or to elect self-representation, he has no right to both at once, unless the interests of justice require it. The Court concluded that this was not a case justifying the trial court's decision to allow Defendant to make such a statement to the jury. That Court found that the trial court had abused its discretion in this case and that the trial court's observations of Defendant's conduct during the proceedings would not support its decision in this situation.

## A.

■ One of the most fundamental responsibilities of a trial court in a criminal case is to assure that a fair trial is conducted. *See, e.g., State v. Burhart, supra,* at 371. Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve this primary purpose, and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried. *Cf. State v. Northington, supra,* at 62 (" 'The existence of a constitutional pretrial waiver cannot be made to turn on an appellate court's view as to whether, in retrospect, the defendant used relatively good judgment in representing himself at trial.' ") (citation omitted). Although the Court of Criminal Appeals and the trial court both analyzed the issue of this case in terms of Defendant's right to represent himself, we are of the opinion that the controlling issue is whether the trial court abused its discretion in the circumstances of this case.

Contrary to the Court of Criminal Appeals, under Tennessee law, the question of waiver does not necessarily arise when a defendant is in fact represented by counsel at every stage of his prosecution.

"The whole thrust of *Faretta* is that a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so. *Faretta* does not touch upon the basic issue involved in this controversy and, therefore, affords no authority for the claimed right of a criminal defendant to have the benefit of counsel and *simultaneously* to represent himself."

*State v. Burkhart, supra,* at 368 (emphasis in original). Defendant was represented throughout these proceedings by two competent, highly qualified and experienced attorneys. At no time did he stand alone against the State's arsenal of attorneys unassisted by counsel for his defense. Neither *Faretta v. California, supra,* nor *State v. Northington, supra,* apply to a case in which a defendant is represented continuously by counsel. *See State v. Burkhart, supra. See also, e.g., People v. Barnes,* 130 Ill.App.3d 1026, 86 Ill.Dec. 268, 270, 475 N.E.2d 265, 267 (1985); *People v. Rodriguez,* 98 A.D.2d 961, 470 N.Y. S.2d 64, 66–67 (1983); *Phillips v. State,* 604 S.W.2d 904, 908 (Tex.Crim.App.1979).

■ Accordingly, the determinative issue is whether the trial court abused its discretion in permitting what is known as "hybrid representation" (that is, simultaneous representation by counsel and *pro se* ). Ordinarily, a defendant must elect to act *pro se* or to accept representation by counsel. *See McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); *State v. Northington, supra; State v. Melson,* 638 S.W.2d 342 (Tenn.1982); *State v. Burkhart, supra.* Whether to allow hybrid representation is committed to the discretion of the trial court. " '[W]hether the court allows defendant to make a closing statement or, indeed, whether he shall be allowed to intermittently use counsel during the trial while he conducts his own defense is within the sound discretion of the trial court.' " *State v. Burkhart, supra,* at 370

(quoting *State v. Whitlow*, 13 Or.App. 607, 510 P.2d 1354 (1973)). *See also McKaskle v. Wiggins, supra*, 104 S.Ct. at 953; *State v. Melson, supra*, at 359; *People v. Rodriguez, supra*, 470 N.Y.S.2d at 66–67; *People v. Hazen*, 94 A.D.2d 905, 463 N.Y.S.2d 657, 660 (1983). *Accord Robertson v. State*, 701 S.W.2d 665, 670 (Tex.App.1985); *Maynard v. Meachum*, 545 F.2d 273, 277 (1st Cir.1976).

### B.

■ This case is decided under Article I, § 9, of the Constitution of Tennessee, which provides in pertinent part "[t]hat in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel...." Prior to 1976, Tennessee cases construing this provision would have permitted the trial court's action in this case because when a defendant demanded "the right to be heard by himself," the court was required "at once [to] instruct him that he may make an argument or an explanation of the circumstances proved against him, but that he can state no facts not already shown to the jury." *Wilson v. State*, 50 Tenn. 232, 242 (1871). *See also Kizer v. State*, 80 Tenn. 564 (1883); *Hopkins v. State*, 78 Tenn. 204 (1882). *Burkhart, supra*, however, reconsidered the construction of this Constitutional provision and concluded that these cases had been undermined by more recent developments in Constitutional law, finding that "the right to dual or hybrid representation is not mandatory, but permissive, and rests within the sound discretion of the trial court. The rule is based upon a compelling policy to retain in the trial judge the power to maintain an orderly administration of justice at the trial level." 541 S.W.2d at 370. This provision of the Tennessee Constitution, therefore, does not guarantee *as of right* a defendant's participation with his counsel in the conduct of his defense in the courtroom.

While *Burkhart* pretermits the issue of waiver in cases of hybrid representation, placing in the trial court the discretion to permit such participation of a defendant,

this discretion must be exercised sparingly and only in exceptional cases:

"It is the foremost responsibility of the trial judge in a criminal action to insure a fair, just and orderly trial. To this end he must have a reasonable amount of judicial discretion. If the interests of justice so require, the trial judge, in exceptional circumstances, may permit the defendant to participate in the trial, to include the cross-examination of witnesses and *the argument of his own defense*. But this discretion should be exercised sparingly and with caution and only after a judicial determination that the defendant (1) is not seeking to disrupt orderly trial procedure and (2) that the defendant has the intelligence, ability and general competence to participate in his own defense. Unsworn statements will not be permitted under any circumstances. We caution, however, that when a defendant argues in his own behalf he is limited to fair comment on the evidence and may not use argument as a guise for an unsworn statement."

*State v. Burkhart, supra*, at 371–372 (emphasis added). The record in *Burkhart* did not support the trial court's decision to permit defendant to participate by hybrid representation. *Id.*, at 372. In *State v. Melson, supra*, this Court again emphasized that the trial court's discretion in such cases should be exercised only in exceptional circumstances. 638 S.W.2d at 359. What constitutes exceptional circumstances cannot be defined; they must be determined on a case by case basis. *Id.* The trial court's decision must be supported by the record. "The mere facts that a defendant is not seeking to disrupt the trial proceedings and that he may be intelligent do not require a trial judge to allow a defendant represented by counsel to participate. These are only threshold considerations...." *Id.*

In *Bontempo v. Fenton*, 692 F.2d 954 (3d Cir.1982), *cert. denied*, 460 U.S. 1055, 103 S.Ct. 1506, 75 L.Ed.2d 935 (1983), a state trial court allowed the defendant at his trial to deliver a summation to the jury along with the closing argument of his

defense counsel. In his Petition for a Writ of Habeas Corpus in Federal Court, defendant contended that the trial court had deprived him of effective assistance of counsel when he was allowed to make such a statement. The Third Circuit Court of Appeals noted that defendant "was, in fact, represented before, during, and after his statement by an experienced defense attorney.... It was defendant's protest in the jury's presence that he was being denied a fair trial which precipitated the trial judge's unusual response." *Id.*, at 960. The record of the trial in *Bontempo* made it clear that defendant, although somewhat encouraged by the trial court to make the statement, made the decision to do so only after consulting with his counsel outside the presence of the judge and jury. The Third Circuit stated that "[t]his is not the case of an unrepresented defendant who is called upon to make an important decision without the benefit of expert advice." *Id.*, at 961. The dissent in *Bontempo,* however, considered the defendant's decision to be a partial waiver of his right to counsel, requiring the same inquiry as in a complete, pretrial waiver of counsel.

The First Circuit Court of Appeals, although analyzing a hybrid representation case as one involving a partial waiver of counsel, found that in such cases "the absence of explicit bench warnings or a colloquy on the record" regarding the validity of the partial waiver did not compel the conclusion that a partial waiver was ineffective. *Maynard v. Meachum, supra,* at 277. That court found that the record in hybrid representation cases need only show that the defendant's conduct affirmatively demonstrates that he knew what he was doing under all the circumstances of the case. *Id.*, at 277–278.

Furthermore, in *People v. Hazen, supra,* the trial court exercised its discretion to permit a defendant to act as co-counsel with his attorney. The concurring opinion, written by Justice Mahoney, reasoned that:

"Rather than proceeding with his defense at trial alone, defendant was allowed to join forces with his lawyer in the management and presentation of his defense. As such, defendant received all of the benefits of representation by counsel. Simply stated, he did not need to be warned of the risks associated with self-representation because he was not, in fact, proceeding in his defense at trial without counsel."

463 N.Y.S.2d at 661 (citations omitted). The reasoning of this concurrence was subsequently and explicitly adopted in *People v. Rodriguez, supra:*

"While a defendant who is represented by counsel in a criminal case has no absolute right to participate, the court may, in the exercise of its discretion, permit participation by the defendant to the extent it finds it appropriate.... Under the particular circumstances of this case, we find no abuse of discretion in the permission to participate granted to defendant.... Inasmuch as defendant did not waive his constitutional right to representation and did not proceed in his defense without the assistance of counsel, an inquiry for the purpose of ensuring that the defendant's waiver was competent, intelligent and voluntary ... was not called for...."

470 N.Y.S.2d at 66–67 (citations omitted).

█ In exercising its discretion in hybrid representation cases, not only must the trial court make the threshold determinations (1) that defendant is not seeking to disrupt the trial, and (2) that the defendant has the intelligence, ability and general competence to participate in his own defense, but the trial court must also ensure (3) that the circumstances are so exceptional as to justify the defendant's request, which circumstances must be made to appear on the record, (4) that defendant has the opportunity to confer with counsel out of the presence of the jury prior to his participation, (5) that, out of the presence of the jury, the defendant is instructed that he may not state facts not in evidence, and (6) that the defendant and the jury are instructed that the defendant is acting as his own counsel and that the defendant is not giving any evidence or testimony.

Even where all these factors could be present, the trial court may nevertheless decline to permit hybrid representation. We believe that only rarely will circumstances justify the exercise of this discretion, but a defendant has no absolute right to hybrid representation or to make an unsworn statement before the jury. *See State v. Melson, supra; State v. Burkhart, supra. See also Robertson v. State, supra,* at 670. The question of waiver does not necessarily arise in such a case, but a warning by the trial court concerning the risks of hybrid representation may be appropriate in some cases. We emphasize the case by case nature of hybrid representation situations. "It is entirely a matter of grace for a defendant to represent himself and have counsel, and such privilege should be granted by the trial court only in exceptional circumstances." *State v. Melson, supra,* at 359. We agree with the dissent in *Bontempo v. Fenton, supra,* to this extent: "It is no argument to say that the court merely honored the [defendant's] request. The court exists to protect the constitutional rights of those who appear before it." 692 F.2d at 968 (citation omitted).

### III.

▮ In this case, having summarized the record of the trial heretofore, we are of the opinion that the circumstances justified the exercise of the trial court's discretion, and we will not second-guess the decision of the trial court on this record; however, we reiterate that trial courts cannot freely exercise such discretion absent circumstances justifying such an unusual action as permitting hybrid counsel. Contrary to the trial court's opinion below, he was not required to allow Defendant to participate as of right in his defense at trial. "*Faretta* does not require a trial judge to permit 'hybrid representation' of the type [defendant] was actually allowed." *McKaskle v. Wiggins, supra,* 104 S.Ct. at 953. *See also State v. Melson, supra,* at 359.

▮ Not only are the exceptional circumstances of this case evident on the record

as a whole, but the trial court wisely preserved a record of its reasons for permitting Defendant to make his statement as well. While Defendant did use his trial as a forum for his political and religious beliefs, he never sought to disrupt the trial and was generally well-mannered throughout the proceedings. At no time was the trial court required to recall order to the court due to Defendant's behavior. In denying the Defendant's motion for a new trial, the trial court recorded the observations that led him to the conclusion that Defendant had the intelligence, ability, and general competence to participate in his defense. Although a defendant's actual *pro se* trial performance itself is not relevant to determining the competency of a waiver of counsel, *State v. Northington, supra,* at 61, his personal conduct during trial is relevant to the judge's determination that a defendant, in Judge Meyer's words, "is making a knowing decision on his part" to participate in his defense.

▮ Before Defendant gave his statement, he conferred with his counsel out of the presence of the jury. He did not take the advice of his attorneys that he should not make a closing statement, but that fact alone cannot invalidate the exercise of the trial court's discretion. As the Supreme Court of the United States observed in *McKaskle v. Wiggins, supra,* "[i]f [defendant's] closing statement to the jury had to compete with one made by counsel, it was only because [defendant] agreed in advance to that arrangement." 104 S.Ct. at 955. *Cf. Rodgers v. State,* 610 S.W.2d 25, 28 (Mo.App.1980) ("[Defendant] was not deprived of an opportunity to have the advice of counsel on what disposition should have been attempted in his best interest. He merely refused to accept this advice."). The trial court did not encourage Defendant to make the statement. Defendant spontaneously requested that he be allowed to do so. A relevant factor in the trial court's decision would in some cases be whether any disagreement over trial strategy had arisen between a defendant and counsel, but this factor will not

necessarily weigh in favor of or against the exercise of the court's discretion, since the decision must ultimately depend on the totality of the circumstances in the trial. Moreover, the defense lawyer is to assist a defendant in making his defense and to represent him before the court. The right to a defense is essentially the defendant's, which right is protected by the right to have counsel for the defense. Here, the record shows that Defendant disagreed with his counsel on at least one occasion, but Defendant's conduct throughout trial made it apparent, as the trial court itself noted, that he "was conducting the trial the way he wanted the trial to be conducted." No person can be compelled to take the advice of his attorney. Cf. *Faretta v. California, supra,* 422 U.S. at 834, 95 S.Ct. at 2541 ("[A]lthough he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the life-blood of the law.' ") (citations omitted); *Holloway v. State,* 691 S.W.2d 608, 615 (Tex.Crim.App.1984) (En banc) (right to counsel belongs to accused).

In addition, during a jury-out conference, the trial court stated on the record and in the Defendant's presence that his statement was not testimony, that he was representing himself, and that his remarks to the jury would be considered the same as the arguments of his counsel. We would have preferred that the trial court had been more explicit in instructing the Defendant that he could not state facts not already in evidence, but this was not fatal to this case. When the jury returned, the trial court properly instructed the jury in the Defendant's presence that his statement was not sworn testimony or to be considered as evidence and was merely the statement of the Defendant acting as his own attorney.

Most of the cases we have found in which this issue has arisen involved the unsworn statement of a defendant who did not take the stand but who used the opportunity to make a statement to state facts outside the record. Here, Defendant never made a statement of facts not already in evidence; his statement was a sermon and a political polemic, but it was certainly not evidentiary. Of all that he said the jury was already informed. Defendant's statement, although containing his admission that he had committed the crime, did not go outside the record because his confession to the crime had already been admitted. The State was not denied the opportunity to cross-examine Defendant on any testimony or evidence not previously revealed. Whether the jury believed Defendant's confession was a matter for them to resolve. Moreover, his admission in court could not have undermined the defense strategy since that strategy was that Defendant willingly confessed to this and a number of other crimes to obtain a transfer from Marion. When one of the defense counsel gave his closing argument following Defendant's statement, this strategy was continued uninterrupted, stressing Defendant's ulterior motive and attempting to discredit the confession. The remainder of Defendant's statement was not testimonial in any sense; it was more in the nature of a religious sermon and an appeal to the members of the jury to understand his perception of the urgency of resisting the Jewish conspiracy in which he believes. This may not be desirable, but in a trial in which the Defendant's beliefs were the motive for the crimes for which he was being tried, it was not fatal to his conviction. Finally, we note that the District Attorney in his closing argument did not improperly comment on or otherwise take advantage of the fact that Defendant had argued in his own behalf.

We cannot say that, in the circumstances of this trial and given the evidence against Defendant, the trial court abused its discretion in allowing the Defendant to make a statement to the jury. Further, even if it be considered error, it did not affect the outcome of the jury's deliberations and was, at worst, harmless error. Rule 36, T.R.A.P.; Rule 52, T.R.Crim.P. Cf. *Dukes v. State,* 578 S.W.2d 659, 665 (Tenn.Crim. App.1978) ("Obviously counsel did everything possible to prevent the defendants

263

from jeopardizing their own defense.... Although counsel now says they could not predict or plan a proper defense, no evidence is offered to show how [defendants were] prejudiced.... If the defense was prejudiced in any manner by the conduct of defendants or their choice of defense, that was a matter of their own choosing about which they now have no right to complain."); *State ex rel. Lea v. Brown,* 166 Tenn. 669, 692–693, 64 S.W.2d 841, 848 (1933) (" '[Appellant] participated as an actor in procuring the order which he now seeks to set aside, and took his chance.... To that end there was not only acquiescence on his part, but intelligent and efficient dealing with the matter and consent to the order. By this consent he must be deemed to have made his election and should be held to it.' ") (citations omitted).

Accordingly, although the trial court was incorrect that Defendant had a right to make the statement to the jury in this case, that court did not err in the circumstances of the trial in exercising his discretion to allow Defendant to make a statement to the jury. The judgment of the Court of Criminal Appeals is, therefore, reversed and that of the trial court is reinstated. The costs are taxed to the Defendant.

BROCK, C.J., and FONES, HARBISON and COOPER, JJ., concur.