IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 24, 2013 Session

# DEMETRY MICHELE ALLEN v. HARRY LEE ALLEN, JR.

Direct Appeal from the Chancery Court for Madison County
No. 67343      James F. Butler, Chancellor

No. W2012-00541-COA-R3-CV  - Filed April 3, 2013

The question presented by this appeal is which parent should be named the primary residential parent of the parties' minor child. The trial court named Appellee Mother primary residential parent. Appellant Father appeals. Discerning no error, we affirm and remand.[1]

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and HOLLY M. KIRBY, J., joined.

David W. Camp, Jackson, Tennessee, for the appellant, Harry Lee Allen, Jr.

Lanis L. Karnes, Jackson, Tennessee, for the appellee, Demetry Michelle Allen.

**OPINION**

## I. Background

Appellee Demetry Michelle Allen ("Mother") and Appellant Harry Lee Allen, Jr. ("Father") were married in 1998. At the time of the marriage, Mother had one child, a daughter, from a previous relationship. During the marriage, the parties had one child together, Brandon, born in 1998. Mother filed for divorce on October 26, 2010.  At that time, both parties were still living in the marital home. Father filed his answer and counter-complaint on December 9, 2010. Eventually, Mother filed an answer to Father's counter complaint on April 11, 2011. The issue in this case revolved solely around the question of which parent should be named the primary residential parent of Brandon. Accordingly, we

---

[1]This case was assigned to Judge Stafford on March 8, 2013.

will not tax the length of this opinion with a full recitation of the various pleadings and rulings contained in the record that have no relevance to the issue presented in this appeal.

A *pendente lite* hearing regarding various divorce issues was held on December 13, 2010. On December 15, 2010, the trial court entered a letter ruling, in which it temporarily named Mother primary residential parent. Mother was ordered to facilitate reasonable visitation with Father dependent on his unpredictable work schedule. At the hearing, the trial court also denied Mother's request for exclusive possession of the home. Because both parties remained in the marital home, the trial court ordered them to evenly divide the household expenses, including the mortgage. Despite the trial court's order, however, Mother subsequently moved out of the home into a rental, as discussed in more detail below.

The trial court held another hearing on April 19, 2011 to consider the issues of a temporary parenting plan and temporary child support. The trial court entered an order on these issues on June 20, 2011. In the order, Mother was named the primary residential parent and Father was awarded essentially standard visitation.

The trial court held a final hearing on September 12, 2011 and November 16, 2011. Both parents testified that they were the primary caregiver for the child. Mother further testified that Father had failed to follow the plan previously entered by the Court and that he would often appear at her home to take the child without any prior notice. In addition, Mother testified that Father sometimes fails to spend time with Brandon during his regularly scheduled parenting times. Mother stated that, although she wants Father to adhere to the ordered plan, she has no objections to the child spending additional time with Father, so long as proper notice is provided and the additional time does not interfere with any plans she may have made with the child. In contrast, Mother testified that she did not believe that Father was willing to facilitate a close and loving relationship between her and the child, noting that Father had enrolled the child in tutoring without informing her and that Father often did not return the child at the agreed upon time, or notify her when the child would be returned late. In addition, Mother testified that Father failed to pay child support for several months despite the trial court's order that he do so. Because of Father's failure to pay child support, Mother was required to rely on gifts from friends to survive. According to Mother's testimony, if Father were named the primary residential parent, the child would be required to go to a different school. Mother testified that the child was doing "great" in school, making "As and Bs," and that it was important to stay in the same school district. Mother testified that she had attended all of the child's parent teacher conferences in the last year, but that because of time constraints on the teacher, she was only able to meet with the teacher on one occasion. Further, Mother testified that she and the child participate in community activities together, such as Boy Scouts. Mother also testified that she had some concerns about a motorcycle club that Father had previously participated in, as well as some

of the unsavory establishments Father had taken the child to. Mother finally testified that she did not want her son to testify in court because she thought it was not "healthy."

Mother also testified concerning an incident in March 2010 when she and Father had an altercation. According to Mother, she and Father were engaged in a fight that turned physical, with Father holding Mother down and choking her. When Father left to go into the bedroom, Mother believed that he was going to his gun safe to procure a weapon. Accordingly, she called the police. By the time the police arrived at the home, however, Father had taken the child and left.

Finally, Mother and another witness testified about an incident that occurred in December 2010 while Mother was moving out of the marital home. Mother testified that she feared for her life as well as the life of her son. Accordingly, despite the trial court's order that Mother pay one-half of the mortgage expenses, Mother decided to move from the marital home into a rental home. While Father was away with Brandon, Mother hired a moving truck and recruited several of her friends to help her move her belongings to the new rental home. Father arrived home in the middle of the move. According to the witness, upon seeing strangers removing the furnishings from his home, Father pulled his registered hand gun, which he had a permit to carry. Father informed those moving the things from the home that the house was his and asked them to stop moving his things. The individuals replied that they were simply moving the furnishings as Mother's request and would not unload those items that had already been loaded into the moving truck. Subsequently, Father went into the house and located Mother. According to the witness, Father pointed the gun at Mother and told her to remove the furnishings from the moving truck. At this point, the witness sent a text message to her husband who was a police officer. He and other police officers soon arrived on the scene and Father was arrested. After Father was arrested, Mother continued to move many of the furnishings from the home. The marital home was later returned to the mortgagee pursuant to a deed in lieu of foreclosure agreement. Father subsequently moved into an apartment.

Upon cross-examination, Mother admitted that she had spent a great deal of time trying to advance her career, first obtaining her Master's Degree and then participating in Leader Jackson, a leadership training group that encourages its members to participate in various community social and civic events. Mother testified, however, that those events did not interfere with her ability to parent her son, and instead were an effort to further her career and increase her income. In addition, Mother admitted on cross-examination that her older child had a child out of wedlock. Mother testified, however, that she did not believe that her daughter's decision to have a child reflected poorly on her parenting skills with regard to Brandon.

Father next testified that he spent the majority of the time with the child both throughout the marriage and after the separation. Father testified that despite the trial court's temporary order, he actually spent substantially more time with the child throughout the week than previously ordered. Father testified that while he had previously been required to work some night shifts and weekends at his job, he had been promoted to a new position that allowed him to work regular hours. Thus, Father was able to spend more time with the child than previously expected when the trial court entered the temporary parenting plan. Father explained that Mother acquiesced in this arrangement because it allowed her to attend social events in order to further her career. In addition, Father testified that Mother does not try to interfere with his relationship with the child because she knows that they are close. Father further testified that he participates in his son's after school activities, including attending all of Brandon's baseball practices and games, procuring after school tutoring for Brandon due to his falling grades, and taking the child on various weekend excursions, including to Nashville and Orlando, Florida. The child's baseball coach corroborated Father's testimony that he is more involved than Mother in Brandon's athletics. Father further testified that he did not like his child being around his half-sister, because Father perceives, based on past experiences, that the sister is not a good influence. Mother previously admitted that an altercation occurred between Father and her daughter regarding an incident in which Father alleges daughter engaged in inappropriate behavior while in the home with Brandon. However, Mother denies that anything inappropriate occurred or that the daughter is unfit to be around Brandon.

Father also testified that he is very involved at his son's school, meeting with the teacher several times a year and corresponding by email several times a week. Father explained that his son seemed to be having trouble with his school work as a result of the divorce, so he enrolled the child in after school tutoring. Brandon's teacher corroborated this testimony, stating that Father is very concerned about Brandon's grades and that, while she has met and spoken with Father on several occasions, she has only met Mother once at a scheduled parent-teacher conference. Father also testified that he had researched the high school that Brandon would be required to attend should Father be named the primary residential parent. According to Father, the school in Father's district is more advanced academically than the school in Mother's district, which is considered a failing school.

Finally, Father testified that, although he had displayed his firearm on the day in question, when he arrived at the marital home and did not immediately see Mother accompanying the strangers removing his personal belongings from the home without his permission, he legitimately believed that he was being robbed. In addition, Father denied that he ever pointed the gun at Mother or at anyone else at the home. Father admitted that he was arrested but that he was "finishing up" a probationary term and that the crime would go off his record soon. Father further testified that Mother had previously called the police

due to the March 2010 incident, *supra*, but that he was never charged with any crime regarding that altercation and that he had never been physically violent toward her.

The child was also allowed to express his preference outside the hearing of the parties. The child stated that he wished to live with his Father on a "full-time basis" and that he spends several nights a week with his Father despite the trial court's previous parenting plan. The child specifically stated that he wanted to live with Father because Father helps the child with his homework.

After taking the matter under advisement, the trial court issued a letter ruling on December 5, 2011, in which it declared the parties divorced, classified and divided the marital property, named Mother primary residential parent, set a permanent parenting plan, ordered Father to pay child support, and awarded Mother a judgment on the child support arrearage. On March 13, 2012, the trial court entered an order memorializing the letter ruling, stating with regard to the custody issue:

> In making a comparative analysis between the parties competing for custody, the Court finds that both parties have appropriate love and affection for the child and both parties are willing to provide support. Both parties have adequate financial means with which to provide support.
> The Mother has been the primary caretaker in the past, more so than the Father. This comparison is not meant to diminish the Father's involvement with the child, but simply a finding of the facts.
> The child is 13 years old and makes good grades. He would be required to transfer schools if he resides with Father. The continuity provided by the Mother is an important factor in this case. Mother has been more willing to communicate about the welfare of the child in an appropriate fashion than has the Father.
> While Father has involved the child in activities, and involved himself in the child's sports, the Mother has involved the child in other endeavors, and has been involved with his school as much as Father has.
> Neither person has any person residing in the home or who frequents the home who would have a bad character or behavior. Mother expressed concern about some of Father's motorcycle club friends, but provided no proof of bad character.
> Both parties have adequate residences for the child. Both

seem to have the ability to instruct, inspire and encourage the child to prepare for a life of service. It is fortunate that the Court has two excellent parents in this case.

The child currently is residing with the Mother who is providing a stable and consistent environment. She has sought residence in the child's current school zone.

Neither party's employment schedule would interfere with their ability to care for the child.

Father had at least one incident of bad judgment when he found Mother moving from the marital residence and resorted to pulling a loaded weapon on some of her friends as they were moving. While this is somewhat diminished by the fact that Father did not know about the move in advance, it gives the Court pause as to his judgment.

While the child has indicated a preference to actually reside with the Father, and the Court has considered that preference, the child is only 13 and his preference does not trump best interest.

The Court finds that Mother is comparatively more fit to have the Primary Residential Parent Status. Therefore, Mother will be designated as Primary Residential Parent.

Father filed a timely notice of appeal.

## II. Issue Presented

Father raises a single issue on appeal: Whether the trial court erred when it named Mother primary residential parent of the child?

## III. Analysis

The sole issue in this case is whether the trial court erred in naming Mother primary residential parent. Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Tenn. R. App. P. 13(d). In applying the *de novo* standard, we are mindful that "[t]rial courts are vested with wide discretion in matters of child custody and that the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." ***Hyde v. Amanda Bradley***, No. M2009-02117-COA-R3-JV, 2010 WL 4024905, at *3 (Tenn. Ct. App. Oct.12, 2010) (citing ***Johnson v. Johnson***, 169 S.W.3d 640, 645 (Tenn. Ct. App. 2004)). Because "[c]ustody and visitation determinations often hinge on

subtle factors, including the parents' demeanor and credibility during . . . proceedings," appellate courts "are reluctant to second-guess a trial court's decisions." **Hyde**, 2010 WL 4024905, at *3 (citing **Johnson**, 169 S.W.3d at 645). Accordingly, appellate courts review a trial court's decision regarding which parent to name as the primary residential parent for an abuse of discretion. *See* **Fulbright v. Fulbright**, 64 S.W.3d 359, 365 (Tenn. Ct. App. 2001) (citation omitted); *see also* **Porter v. Porter**, No. M2012-00148-COA-R3-CV, 2013 WL 313838, at *14 (Tenn. Ct. App. 2013) (Kirby, J., concurring) (declining to reverse the trial court's ruling only because of the "high standard" required under abuse of discretion review). "[A] trial court's decision regarding custody or visitation should be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" **Curtis v. Hill**, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006) (quoting **Eldridge v. Eldridge**, 42 S.W.3d 82, 88 (Tenn. 2001)). Thus, it is not within the province of appellate courts to tweak a parenting plan in hopes of achieving a better result than the trial court. *See* **Eldridge**, 42 S.W.3d at 88. As our Supreme Court has explained,

> When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving [parental responsibilities], to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. *See* **State v. Franklin**, 714 S.W.2d 252, 258 (Tenn. 1986) ("appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried"); *cf.* **State v. Pappas**, 754 S.W.2d 620, 625 (Tenn. Crim. App. 1987) (affirming trial court's ruling under abuse of discretion standard while noting that action contrary to action taken by the trial court was the better practice); **Bradford v. Bradford**, 51 Tenn. App. 101, 364 S.W.2d 509, 512–13 (1962) (same). An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record. See, e.g., **State ex. rel Vaughn v. Kaatrude,** 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

*Eldridge*, 42 S.W.3d at 88. The trial court's discretion, however, is not unbounded. *Hogue*, 147 S.W.3d at 251 (citation omitted). The court must base its decision upon proof and apply the appropriate legal principles. *Id.* (citation omitted).

"By statute as well as case law, the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (quoting Cummings v. Cummings, No. M2003-00086-COA-R3-CV, 2004 WL 2346000, at *5 (Tenn. Ct. App. Oct. 15, 2004)). "In choosing which parent to designate as the primary residential parent for the child, the court must conduct a 'comparative fitness' analysis, requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)). "In engaging in this analysis, the court must consider the factors set out in Tennessee Code Annotated § 36-6-106(a)." *Ellis*, 211 S.W.3d at 286 (footnote omitted). While "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination," the statute nevertheless "requires the trial court to consider all the applicable factors."[2] *Murray v. Murray*, No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept.28, 2010). Moreover, this Court has encouraged trial courts to "be as precise as possible in making child custody findings" in order to facilitate meaningful appellate review. *In re Elaina M.*, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 (Tenn. Ct. App. Oct. 25, 2011).

Accordingly, we will consider each applicable factor contained in Tennessee Code Annotated Section 36-6-106(a), along with the trial court's findings and the evidence contained in the record.

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

The trial court found that both parents have "appropriate love and affection for the child." On appeal, the parties do not dispute this finding.

> (2) The disposition of the parents or caregivers to provide the

---

[2] This Court has previously expressed concern that the case law holding that trial judges need not articulate the factors pursuant to Tennessee Code Annotated Section 36-6-106(a) appears to conflict with the intent of Tennessee Rule of Civil Procedure 52.01. *See In re Elaina M.*, No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8 n.13 (Tenn. Ct. App. Oct. 25, 2011).

child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

The trial court found that both parents are "willing to provide support" and have "adequate financial means." However, the trial court found that Mother has been the child's primary caregiver and, thus, found this factor to weigh in her favor. Father disputes this finding and points to evidence in the record that shows that he is more involved in the child's school and extracurricular activities. The term "caregiver" means "the person or persons or entity or entities responsible for providing for the supervision, protection and basic needs of the child." Tenn. Code Ann. §37-5-501(b)(1). Respectfully, the evidence in the record supports Father's contention that he has assumed considerable responsibility for the child's needs. The undisputed evidence shows that Father is very involved in the child's life and spends a substantial amount of time with the child, both in extracurricular activities and attending to his basic needs. To rebut this allegation, Mother argues that the trial court previously named her primary residential parent in an earlier order, giving her substantially more time with the child. However, Mother admitted in her testimony that Father spends more time with the child than is reflected in the temporary parenting plan, but that Father does this without her approval. In addition, Mother testified that she is involved with the child's Boy Scouts activities, has attended his parent-teacher conferences, and has emailed with his teacher. While the trial court's findings are entitled to a presumption of correctness on appeal, Tenn. R. App. P. 13(d), we must conclude that the weight of the evidence in the record shows that both Mother and Father spend significant amounts of time with the child and that both parents may equally be considered the primary caregiver for the child. Accordingly, this factor favors neither party.

> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

The trial court found that the issue of continuity weighed in favor of naming Mother primary residential parent because the child had primarily resided with Mother since the parties' separation and the child would be forced to attend school in a different school district if Father is named the primary residential parent. The child's school district at the time of trial was the same school district as throughout the marriage. The trial court apparently placed great weight on this factor, noting that it was "important." Father disputes this finding, noting that all of Father's witnesses testified that Father provides the child with a "stable, satisfactory environment." The evidence in the record, however, does not preponderate against the trial court's finding that the child's life would be disrupted if he were required to change school districts. Accordingly, this factor weighs in favor of Mother.

(4) The stability of the family unit of the parents or caregivers;

The trial court did not make specific findings as to this factor. Nothing in the record suggests that either parent's home lacks stability. Both parents have stable employment and appropriate homes for the child. Accordingly, this factor does not weigh in either parties' favor.

(5) The mental and physical health of the parents or caregivers;

The trial court did not make a finding as to this factor. Nothing in the record suggests that either parent's mental or physical health would interfere with their ability to parent the child.
.

(6) The home, school and community record of the child;

The trial court specifically found that the child made "good grades." Indeed, the record shows that the child is performing adequately in school and is involved in athletics, Boy Scouts, and other civic groups. This factor does not weigh in favor of either parent.

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

The child expressed a preference to live with Father.[3] While this factor certainly weighs in favor of Father, we note that the child was only thirteen when he expressed his preference and that "[t]he preferences of older children should normally be given greater weight than those of younger children." Tenn. Code Ann. § 36-6-106(7)(B). In addition, the child's preference, while relevant, is only one factor to be considered and is not binding, nor determinative on the court. *See Hoalcraft v. Smithson*, 19 S.W.3d 822, 829 (Tenn. Ct. App. 1999); *Harris v. Harris*, 832 S.W.2d 352, 354 (Tenn. Ct. App. 1992).

---

[3] We note that prior to hearing the child's preference, the trial court did not place the child under oath in apparent violation of Rule 603 of the Tennessee Rules of Civil Procedure. Rule 603 provides that "[b]efore testifying, every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness's conscience and impress the witness's mind with a duty to do so." Mother raised this issue to the trial court, who reassured Mother that the child was not testifying as a witness, but was merely expressing his preference. The issue of the failure to place a child under oath when expressing his or her preference to the court was previously raised in the case of *Cupples v. Cupples*, 1995 WL 650134 (Tenn. App. 1995). The Court concluded that the issue was waived, however, due to the mother's failure to raise the issue in the trial court. *Id.* at *4. In this case, Mother raised the issue in the trial court, but does not assign the trial court's failure to place the child under oath as an error on appeal. Accordingly, the issue is likewise waived. *See* Tenn. R. App. P. 13(b).

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

Relevant to this factor, the trial court specifically found that Father had engaged in at least one instance of bad judgment when he pulled his firearm and threatened both Mother and her companions when she was moving from the home. Father did not deny that he had brandished a weapon when he arrived home to find strangers moving his belongings from the marital home, but argued that he was justified in doing so because Mother did not inform him she was moving. Father also admitted a previous instance where Mother called the police for domestic violence issues, but stated that Mother's allegations in that case were completely unfounded. We agree with the trial court that the December 2010 incident, and Father's reaction, is relevant to the question of which parent is comparatively more fit to be named the primary residential parent. While "[c]ustody decisions are not intended and should not be designed to . . . punish [parents] for their human frailties or past missteps," *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006); *Kesterson v. Varner*, 172 S.W.3d 556, 561 (Tenn. Ct. App. 2005); *Earls v. Earls*, 42 S.W.3d 877, 885 (Tenn. Ct. App. 2000), a parent's action which evinces a lack of judgment is certainly relevant to any custody determination. The trial court specifically found that Father's action in brandishing a loaded weapon during this incident "gives the Court pause as to his judgment." Although Father proffered some justification for his actions, the evidence in the record does not preponderate against the trial court's finding that Father's action involving the weapon calls into question his judgment.

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child;

The trial court specifically found that no other persons reside in or frequent the homes of Mother or Father that would have a negative impact on the child. Father, however, argues that Mother's daughter's presence in Mother's home, is a factor that weighs against Mother being named primary residential parent. The trial court's order does not mention Father's allegations that Mother's daughter engaged in inappropriate activities in the presence of the child. Accordingly, the trial court apparently did not credit Father's testimony regarding the fitness of Mother's daughter to be around the child. The trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Franklin County Bd. Of Educ. v. Crabtree*, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002)). Father

directs us to no clear and convincing evidence other than his own testimony that would support a finding that Mother's daughter is unfit. Accordingly, Father has failed to meet his burden to show that the trial court erred in discrediting Father's testimony on this issue. It is undisputed, however, that Mother's daughter did have a child out of wedlock. Father cites no law in which this situation alone has been held to constitute a factor weighing against one parent in a custody situation. Accordingly, we decline to hold that the fact that a person, who has had a child out of wedlock, frequents or resides in the home, without some additional evidence of bad behavior on the part of that person, is sufficient to show that the child at issue will be exposed to behavior or character that will have a negative impact on the child. Accordingly, this factor weighs in favor of neither parent.

> (10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

The trial court found that both parents "have the ability to instruct, inspire and encourage the child to prepare for a life of service." However, the trial court also found that "Mother has been more willing to communicate about the welfare of the child in an appropriate manner than has the Father." The evidence shows that Father often took the child for more than his scheduled visitation and that he enrolled the child in tutoring without first informing Mother. In contrast, Father testified that Mother has never attempted to interfere with the close relationship between the child and Father. Accordingly, the evidence does not preponderate against the trial court's finding that Mother is the parent more willing to facilitate a close and loving relationship with the other parent. Thus, this factor weighs in favor of Mother.

After a review of the relevant factors, we note that factors 1, 2, 4, 5, 6, and 9 weigh in favor of neither party. Factors 3, 8, and 10 weigh in favor of Mother and only factor 7, the child's preference, weighs in favor of Father. As previously discussed, however, the

-12-

child's preference is not dispositive when the evidence shows that another arrangement is in the child's best interest. *See Harris*, 832 S.W.2d at 354. In addition, this Court has held that:

> Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of [one parent or the other]. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and [his or her parents], the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (applying the above doctrine in a termination of parental rights case). In this case, the evidence shows that Mother has been providing a safe, stable environment for the child and that she has worked to facilitate a close and loving relationship with Father. Moreover, a change in custody would require the child to attend a different school district, further disrupting the child's life, a factor that the trial court deemed "important." Although the evidence in the record does show that Father is very involved in the child's life and has also served as the child's caregiver, as previously discussed, we are required to affirm the trial court's designation of primary residential parent unless the decision amounts to an abuse of the trial court's discretion. *See Eldridge*, 42 S.W.3d at 85. Based on the evidence in the record, we cannot conclude that the trial court abused its discretion in naming Mother the primary residential parent.

For the foregoing reasons, the judgment of the Madison County Chancery Court is affirmed. The case is remanded for further proceedings as may be necessary and are consistent with this opinion. Costs of this appeal are assessed to Appellant Harry Lee Allen, Jr., and his surety.

_____
J. STEVEN STAFFORD, JUDGE