# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 22, 2004

## STATE OF TENNESSEE v. EMMANUEL S. TROTTER

**Appeal from the Criminal Court for Montgomery County**
**No. 40100449    John H. Gasaway, III, Judge**

---

**No. M2003-02292-CCA-R3-CD - Filed January 31, 2005**

---

The appellant, Emmanuel S. Trotter, also known as "Batman," was indicted on charges of felony murder, first degree premeditated murder, especially aggravated burglary, and especially aggravated robbery. The appellant primarily represented himself at trial and was ultimately convicted by a jury of criminally negligent homicide, especially aggravated burglary, criminal attempt to commit especially aggravated robbery, and second degree murder. The trial court merged the criminally negligent homicide conviction with the second degree murder conviction and sentenced the appellant to an effective sentence of fifty-five years. The issues presented on appeal are whether: (1) the appellant made a knowing and intelligent waiver of his right to counsel; (2) the evidence sufficiently corroborated the accomplice testimony of Helen Trotter; (3) the evidence was sufficient to support the verdict; and (4) the State knowingly proffered false testimony. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Patricia L. Snyder, Nashville, Tennessee, for the appellant, Emmanuel S. Trotter.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; John Carney, District Attorney General; and C. Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

<u>Factual Background</u>

On August 29, 2000, Helen Trotter[1] was at her friend "Red's" house. While at "Red's" house, she purchased a ten dollar piece of crack cocaine. Ms. Trotter smoked the crack cocaine with a man she met that night at "Red's" house, Clifford Eugene Elliot III, also known as "Cucumber." Ms. Trotter and Mr. Elliot returned to Ms. Trotter's house in the Lincoln Holmes Projects in Clarksville, Tennessee in Mr. Elliot's white Cadillac. When they approached Ms. Trotter's house, the two noticed the appellant, Brian Merriweather and a third black male on her front porch.

Ms. Trotter has known the appellant for approximately eighteen years. Ms. Trotter claims that as she and Mr. Elliot approached her house, the appellant asked to use Mr. Elliot's car.[2] The appellant, Mr. Merriweather, and Mr. Elliot drove off together in the car for a short time. While they were gone, the third individual, identified by Ms. Trotter as "Cece," remained at the house with her. The three men returned, and the appellant and Mr. Elliot went inside Ms. Trotter's house, where the appellant proceeded to give Mr. Elliot drugs for the use of his car.

The appellant asked Ms. Trotter to go somewhere with him. She did not agree until she saw a gun in the appellant's waistband. At that point, the appellant, Ms. Trotter, Mr. Merriweather, and "Cece" all got into Mr. Elliot's car. Mr. Elliot remained at Ms. Trotter's house with Ida Mae, one of Ms. Trotter's friends who agreed to babysit for Ms. Trotter's children for a few minutes. The group drove towards Second Street in the white Cadillac. The appellant told Ms. Trotter that she needed to go knock on the door of an apartment house to get a "white guy" to open the door because he owed the appellant some money. The car pulled up near a home on Second Street that contained several apartments, one of which was leased by Raymond "Fannie" Brown, the victim. When they arrived, Ms. Trotter and the appellant got out of the car. Ms. Trotter knocked on the door, but no one answered. When no one answered the door, the appellant walked around the house and knocked on a window. The appellant and Ms. Trotter walked back to the car and the four individuals drove off together.

Once in the car, Ms. Trotter asked to go home, but the appellant and Mr. Merriweather told her "no." They drove around for a few minutes before going back to the house on Second Street. The appellant and Ms. Trotter got out of the car for a second time. According to Ms. Trotter, the appellant took a white towel, placed it over the glass on the front door, and broke the glass with a

_____

[1]Ms. Trotter is unrelated to the appellant.

[2]Mr. Elliot thought that Mr. Merriweather was the person who initially asked to use the vehicle.

gun.  The two again returned to the car.  The four drove off again.  While they drove around, the appellant and Mr. Merriweather discussed the layout of the house and the apartments inside, as well as the location of a black bag which contained the keys for another bag that contained money.

The third time they arrived at the house on Second Street, the appellant, Ms. Trotter, and "Cece" got out of the car, and Mr. Merriweather drove away.  As they approached the building, Ms. Trotter saw a car drive by the house.  The appellant unlocked the door to the apartment house by sticking his hand through the broken window, and all three individuals went inside.  Once inside, Ms. Trotter sat down in a chair.  The appellant and "Cece" told her to sit there and watch while they went upstairs to the apartment of Raymond "Fannie" Brown, the victim.  They handed her a cell phone so she could talk to Mr. Merriweather, who was still in the car.  Ms. Trotter heard a door being kicked in and heard the appellant say, "Bitch, where is the money" two or three times.  Ms. Trotter heard a muffled pop.  Mr. Merriweather heard the pop over the phone and assured her that it was "just a gunshot."

After the gunshot, Ms. Trotter heard scuffling and fighting on the second floor.  She heard the appellant say, "He's got a gun."  She then heard five more shots and what sounded like a woman screaming and hollering for help.  She heard what she thought was a body hit the floor, so she went to the car.  The appellant and "Cece" came running out of the house and jumped into the car.  The appellant was carrying a revolver with a brown handle.  While they were driving away, Ms. Trotter heard the appellant laughing and bragging about how he shot the victim.  The appellant told Ms. Trotter that he was laying on top of the victim and held a blanket over the victim's head and shot the victim in the back of the head.  The appellant told Ms. Trotter that he fired the other shots because the victim had a gun pointed at "his boy's" back.

Mr. Merriweather and "Cece" got out of the car at the Greenwood Projects in front of the Headstart school.  The appellant slid into the driver's seat and Ms. Trotter got into the front passenger seat.  The appellant handed Ms. Trotter a gun, which felt hot in her hands.  Ms. Trotter wiped blood off of the gun with a white towel.  The appellant and Ms. Trotter left the Headstart building and headed towards a pool room.  The appellant claimed that he had shot "Fannie."  The appellant told Ms. Trotter that they were going to the pool room to get rid of the gun and to provide an alibi.  Once they arrived at the pool room, the appellant went inside with the gun.  The appellant returned a short while later, telling Ms. Trotter that he had given the gun away and that he had gotten her a piece of "dope" in return.

Leroy Everett, a friend of the victim, approached the appellant and Ms. Trotter at the pool hall and asked for a ride back to Lincoln Homes.  The appellant agreed.  After dropping Mr. Everett off, the appellant and Ms. Trotter drove to her house.  Mr. Elliot was waiting on the steps.  The appellant handed Mr. Elliot the keys to his vehicle and went inside the house.

Shortly thereafter, the appellant and Ms. Trotter walked down the street to Brother's Market so that the appellant could place a phone call.  Ms. Trotter heard the appellant say, "It was dead.  I had to shoot the punk."  Phone records indicated that the phone call was placed to the appellant's

first cousin, Shawn Brunell Dowlen, at his girlfriend's residence. Mr. Dowlen denied talking to the appellant on the night of the incident.

Around 2:00 a.m., about the same time as Ms. Trotter claimed the four individuals went to the house on Second Street, Joe Allen Martin returned to his home at 410 South Second Street. While he was turning into his driveway, he saw a black male and a white female walking up the sidewalk. The lady was slim and wearing a white outfit. Mr. Martin remembers hearing what he thought sounded like firecrackers as he dozed off that night.

At approximately 2:30 a.m. on the morning of August 30, 2000, the Clarksville 911 dispatch center received a call regarding a shooting on South Second Street. The call was made by George Stephen Maas, a resident of the apartment house who claimed he woke up from his sleep to what he thought sounded like hail stones hitting the roof. He heard someone running up and down the stairs and out the door and could tell that there were at least two people running on the steps. Upon investigation, Mr. Maas discovered a hole in the door, a hole in the window, and glass on the floor of the house. Mr. Maas went upstairs to apartment 5, the apartment of the victim. Mr. Maas noticed that the door was open and that the victim was lying inside of his room. The victim did not respond when Mr. Maas asked him if he was okay, so Mr. Maas went back to his room and called 911.

Norma Jean Henderson, a resident of South Second Street arrived home around 2:30 a.m. on the night of the incident. She noticed a white car on Union Street with two black males inside the car. About twenty minutes after seeing the car, Ms. Henderson noted that police cars began arriving at the victim's house.

Officer Darren Koski responded to the 911 call. When he arrived at the scene, he did not see anyone at the front of the home. After securing the perimeter, Officer Koski and another officer went inside the residence, where they were directed upstairs. As he approached the top of the stairs, Officer Koski saw the victim, a black male, sitting in the doorway with his eyes closed and his head pointed downward. The room that the victim was in was in total disarray. The victim's breath was shallow so the officers began to perform CPR on the victim until the emergency personnel arrived. The victim later died as result of his injuries.

Leroy Everett described the victim as a person who had a reputation for carrying large amounts of cash in a little black pouch. He knew the victim to keep his apartment neat and clean and knew about the victim's reputation for selling drugs.

Officer Timothy Saunders helped to process the crime scene. He collected a .38 caliber semiautomatic weapon that was laying on the floor underneath the victim's arm. The weapon was loaded with bullets and had a magazine inside the weapon. A Smith & Wesson handgun and another .38 caliber revolver were recovered near the victim's bed. The victim's bed sheet had a hole in it. Officer Saunders was unsuccessful in obtaining any latent fingerprints from the crime scene. The officers were able to obtain a handprint from the plaster wall in the stairwell of the house. The handprint matched that of Cecil Hugh Edward Moss, Jr.

-4-

The appellant was indicted in a multi-count indictment along with Brian Merriweather and Cecil Hugh Edward Moss, Jr. by the Montgomery County Grand Jury in April of 2001, for first degree premeditated murder, felony murder, especially aggravated burglary, and especially aggravated robbery. The trial court appointed counsel for the appellant. Not long thereafter, the appellant filed a motion "for request of pro se representation with support or aid of counsel." The appellant then filed numerous pro se pre-trial motions in the trial court, including: (1) a motion to modify the indictment; (2) a "request of notice of State's intention to use evidence;" (3) a motion requesting a bill of particulars; (4) a motion "requesting timely response from the State to defendants [sic] motions;" (5) a motion for severance; (6) a "motion for judgment on accomplice;" (7) a motion to dismiss; and (8) a request for special jury instructions.

At a hearing on November 2, 2001, the court commented on a motion filed by the appellant in which he sought the permission to represent himself with the "support or aid of counsel."[3] At that hearing, the following colloquy occurred:

> [THE COURT]: You have filed a motion asking the Court to permit you to represent yourself, is that right?
> [THE APPELLANT]: Yes, I have.
> [THE COURT]: Do you understand, . . . [appellant], that the Court has appointed you a lawyer already?
> [THE APPELLANT]: Uh-huh.
> [THE COURT]: Is that yes?
> [THE APPELLANT]: Yes.
> [THE COURT]: And are you - - are you schooled in the law?
> [THE APPELLANT]: Well, I have general knowledge of the rules of the court and rules of criminal procedure. Enough to where I feel like I can do this.
> [THE COURT]: Your motion is granted. Good luck.

The trial court went on to tell appointed counsel that he could "assist" the appellant in his defense. At a subsequent hearing held on March 11, 2002, appointed counsel was present, but the appellant argued several motions before the trial court without the assistance of counsel.

At the outset of the trial, the trial court commented:

> The Court has been advised in pretrial matters or pretrial hearings by Mr. Trotter that he wished to represent himself and indeed, he has done so at pretrial motions, but before we get started this morning, I would like to ask Mr. Trotter if he intends to proceed on to represent himself today at trial?

When the appellant responded affirmatively, the following colloquy occurred:

---

[3]This motion does not appear in the technical record provided to this Court.

[THE COURT]: I just want to spend a few minutes on the record before we go forward. I want to go over some things with you so that you have an opportunity to discuss this with . . . [appointed counsel]. You, of course, have a constitutional right to represent yourself and you have exercised that right and today, you have indicated that you wish to continue to do that. And certainly, you may. But - - I do want to call a few things to your attention in that regard, so that you will reflect on it before we go forward.

You are represented by . . . [appointed counsel]. . . .[The appellant and appointed counsel] have worked together in preparation for trial, haven't you?

[THE APPELLANT]: Yes, we have.

[THE COURT]: . . . [Appointed counsel] is perfectly capable of representing you in this trial and I am sure that . . . [appointed counsel] is prepared to do anything that you instruct him to do; is that right, . . . [appointed counsel]?

[APPOINTED COUNSEL]: Yes, your Honor.

[THE COURT]: And just because you indicate that you want to represent yourself, I want you to understand that that doesn't mean that you have to do everything in the trial. . . . [Appointed counsel] can participate to whatever extent you want him to participate. He can examine one or more witnesses. He can conduct the jury selection questions. In other words, I just want you to understand that just because you represent yourself, that doesn't mean that you have to do everything. Do you understand that?

[THE APPELLANT]: Yes, I do.

[THE COURT]: And so if you want to have . . . [appointed counsel] participate, then he's ready, willing and able to do that. And you should call upon him to do things that you feel like you should, do you understand that?

[THE APPELLANT]: Yes, I do.

[THE COURT]: So - - now, this trial is about to begin and it is going to be a jury trial and as an accused defendant you have certain Constitutional Rights, and I know that - - I am sure that . . . [appointed counsel] has gone over all these with you, but I want the record to be clear that they have been told to you so that you can decide finally, whether you want to represent yourself.

You have the right to a jury trial and you are about to have one. It is up to the jury to decide based on the evidence that is presented during the course of a trial, whether you are guilty or not guilty of any one or all of the charges that you are accused of. Now, you are accused of homicide, first-degree homicide under two different theories. The State has accused you in count one of committing homicide as a result of felony murder, as it is called. That is a homicide, first-degree homicide occurred during the course, perpetration of a felony.

They have also accused you in count four with the theory of premeditated murder, first-degree premeditated murder. That's two different theories as to how the crime was committed, do you understand that ?

[THE APPELLANT]: Yes, I do.

[THE COURT]: They have also charged you in Count three with especially aggravated burglary and in Count three [sic] with especially aggravated robbery, so the jury will be called upon to decide each of these counts, do you understand that?

[THE APPELLANT]: Yes, I do.

[THE COURT]: Now, the jury has to make its decision based on the evidence that is presented. And the Verdict of the jury has to be based on the legal standard of proof beyond a reasonable doubt. Do you understand that?

[THE APPELLANT]: Yes.

[THE COURT]: Now, . . . [appointed counsel] is a lawyer and he is trained in the law. And he has been to school and he has experience in the courtroom and he has tried cases. And he has conducted all phases of trial. Not only does he have the legal background, but he also has the experience and the practical application of that education; do you understand that?

[THE APPELLANT]: Yes.

[THE COURT]: And so one of the other rights that you have at that trial, is the right to confront and cross examine the state's witnesses. Typically, people do that through their lawyers. They allow their lawyers to confront the witnesses and cross examine them in conjunction with their counsel and conference with you, and . . . [appointed counsel] again, has examined many witnesses, and he understands the rules of evidence and he understands the rules of criminal procedure, and he understands the pitfalls that come with examining a witnesses [sic] such things as we call opening doors, where you ask a question that allows a witness to go into things that otherwise, they wouldn't be allowed to go into, because you asked something that you didn't know any better, do you understand that?

[THE APPELLANT]: Yes, I do.

[THE COURT]: And you have the right to subpoena in and cause witnesses to come into Court to testify on your behalf and in your Defense. And again, . . . [appointed counsel] knows the type of questions to ask in examining those witnesses; do you understand that?

[THE APPELLANT]: Yes sir.

[THE COURT]: You have the right to testify or not to testify. That's another right that I am sure . . . [appointed counsel] has gone over with you, is that correct?

[THE APPELLANT]: Yes, he has.

[THE COURT]: And - - well, is there anything about this that causes you any concern or troubles you or makes you feel like you want to second-guess representing yourself?

[THE APPELLANT]: No.

[THE COURT]: Okay, so you are prepared to go forward today, is that right?

[THE APPELLANT]: That's right.

[THE COURT]: And you understand you can participate to any extent that you want to or you can let . . . [appointed counsel] participate to whatever extent you want him to, do you understand that?

[THE APPELLANT]: Yes, I do.

[THE COURT]: All right.

After the appellant made the decision to represent himself, the appellant conducted his own voir dire. During voir dire, the trial court informed the jury of the appellant's decision to represent himself. During the trial, which lasted several days, the appellant gave his own opening statement and cross-examined many of the State's witnesses without the assistance of appointed counsel. At the conclusion of the proof, appointed counsel made the closing argument and argued several motions, including a motion for judgment of acquittal before the trial court.

After deliberating, the jury found the appellant guilty of second degree murder, criminally negligent homicide, criminal attempt to commit especially aggravated robbery, and especially aggravated burglary. After trial, the appellant filed a pro se motion for judgment of acquittal. Several days later, appointed counsel for the appellant filed a combination motion for judgment of acquittal and motion for new trial, alleging various grounds for relief. A hearing was held on June 10, 2002. The trial court orally denied both motions after hearing argument from both the appellant and counsel.

In November of 2002, the appellant filed a pro se motion in arrest of judgment in accordance with Tennessee Rule of Criminal Procedure 34. Sometime in early 2003, counsel was appointed for appeal at the request of the appellant. New counsel proceeded to file a renewed motion for new trial[4] in which the following issues were raised: (1) whether the appellant knowingly and intelligently waived his right to assistance of counsel; (2) whether the testimony of Helen Trotter was sufficiently corroborated; (3) the sufficiency of the evidence; (4) whether the State knowingly proffered false testimony;[5] and (5) whether the State committed prosecutorial misconduct by referring to evidence not introduced at trial. A hearing was held on the motion in which the trial court heard testimony from various witnesses, including Leonia Sanders. She testified that she had lied during her trial testimony and that the appellant did not tell her that he had killed the victim. After hearing the proof, the trial court denied the motion for new trial and this appeal ensued.

On appeal, the appellant presents the following issues for review: (1) whether the appellant made a knowing and intelligent waiver of his right to counsel; (2) whether the evidence sufficiently corroborated the accomplice testimony of Helen Trotter; (3) whether the evidence was sufficient to support the verdict; and (4) whether the State knowingly proffered the false testimony of Leonia Sanders.

---

[4]While the renewed motion for new trial was not filed until well after the trial court orally denied the appellant's first motion for new trial, the trial court had not yet filed a written order disposing of the motion for new trial. Thus, the renewed motion for new trial was timely because the trial court retained jurisdiction. See State v. Bough, ___ S.W.3d ___, 2004 WL 2481367 (Tenn. 2004).

[5]The motion specifically challenged the testimony of the appellant's ex-girlfriend, Leonia Sanders, who testified at trial that the appellant told her shortly after the murder that he shot and killed the victim.

-8-

Waiver of Counsel

The appellant argues on appeal that the trial court erred by denying him his constitutional right to the assistance of counsel. Specifically, he argues that the trial court failed to ascertain whether he made a knowing and intelligent waiver of his right to the assistance of counsel and failed to obtain a written waiver of his right. The State counters that this issue is without merit because the appellant made a knowing and intelligent waiver of his right to counsel. Further, the State argues that the issue of waiver is precluded because the appellant "was never deprived of his right to the assistance and aid of counsel" where the trial court allowed appointed counsel to assist the appellant at all phases of trial.

Both the Tennessee and the United States constitutions grant a defendant the right to assistance of counsel in the preparation and presentation of a defense to a criminal charge. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition, the Sixth Amendment implicitly provides a defendant the right of self-representation. Faretta v. California, 422 U.S. 806, 819 (1975); State v. Northington, 667 S.W.2d 57, 60 (Tenn. 1984). In Tennessee, courts have recognized only two basic constitutionally-guaranteed methods of representation of a criminal defendant: pro se or through an attorney. These rights are alternative. A defendant has no state or federal constitutional right both to represent himself and to be represented by counsel. State v. Burkhart, 541 S.W.2d 365 (Tenn. 1976).

However, a third method of "hybrid" representation may be allowed at the discretion of the trial court when there are "circumstances justifying such an unusual action." State v. Franklin, 714 S.W.2d 252, 261 (Tenn. 1986). Hybrid representation is the term for simultaneous pro se representation and representation by counsel. Id. at 258. In this type of representation, both defendant and counsel can participate in the trial before the jury, including voir dire, questioning witnesses, or making statements. In other words, the accused, who is represented by counsel, participates in the trial as co-counsel with his or her attorney. The Tennessee Supreme Court has urged trial courts to exercise this discretion "sparingly and with caution." Franklin, 714 S.W.2d at 259; State v. Melson, 638 S.W.2d 342, 359 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983). Only in exceptional circumstances is this type of representation appropriate. The reasons for such an unusual arrangement must appear in the record. Franklin, 714 S.W.2d at 258-61.

In order to activate the right of self-representation, the defendant must: (1) timely assert the right to proceed pro se; (2) clearly and unequivocally exercise the right; and (3) knowingly and intelligently waive his or her right to assistance of counsel. State v. Herrod, 754 S.W.2d 627, 629-30 (Tenn. Crim. App. 1988). The appellant herein maintains the third condition was not met. Generally, a defendant must assert the right of self-representation prior to jury selection to be considered timely. See id. at 629. In determining whether a defendant intelligently and knowingly waived his right to counsel, the trial court must question the defendant extensively regarding his ability to represent himself. Northington, 667 S.W.2d at 61; Herrod, 754 S.W.2d at 630. A defendant need not have "technical legal knowledge" in order to exercise his right of self-representation. Faretta, 422 U.S. at 836.

Rule 44(a) of the Tennessee Rules of Criminal Procedure states the following:

Every indigent defendant shall be entitled to have counsel assigned in all matters necessary to the defense and at every stage of the proceedings, unless the defendant executes a written waiver. Before accepting such waiver the court shall first advise the accused in open court of the right to the aid of counsel at every stage of the proceedings. The court shall, at the same time, determine whether there has been a competent and intelligent waiver of such right by inquiring into the background, experience and conduct of the accused and such other matters as the court may deem appropriate. Any waiver accepted shall be spread upon the minutes of the court and made a part of the record of the cause.

In Smith v. State, 987 S.W.2d 871 (Tenn. Crim. App. 1998), this Court recommended that in cases where a defendant aspires to proceed pro se, the trial court should conduct its inquiry in accordance with the guidelines contained in 1 Bench Book for United States District Judges 1.02-2 to -5 (3d ed .1986).[6]

---

[6]The following excerpt is from United States v. McDowell, 814 F.2d 245, 251- 52 (6th Cir. 1987) (quoting Guideline[s] For District Judges from I Bench Book for United States District Judges 1.02-2 to -5 (3d ed.1986)):

When a defendant states that he wishes to represent himself, you should . . . ask questions similar to the following:
(a) Have you ever studied law?
(b) Have you ever represented yourself or any other defendant in a criminal action?
(c) You realize, do you not, that you are charged with these crimes: (Here state the crimes with which the defendant is charged.)
(d) You realize, do you not, that if you are found guilty of the crime charged in Count I the court must impose an assessment of at least $50 ($25 if a misdemeanor) and could sentence you to as much as __ years in prison and fine you as much as $__?
(Then ask him a similar question with respect to each other crime with which he may be charged in the indictment or information.)
(e) You realize, do you not, that if you are found guilty of more than one of those crimes this court can order that the sentences be served consecutively, that is, one after another?
(f) You realize, do you not, that if you represent yourself, you are on your own? I cannot tell you how you should try your case or even advise you as to how to try your case.
(g) Are you familiar with the [Tennessee] Rules of Evidence?
(h) You realize, do you not, that the [Tennessee] Rules of Evidence govern what evidence may or may not be introduced at trial and, in representing yourself, you must abide by those rules?
(i) Are you familiar with the [Tennessee] Rules of Criminal Procedure?
(j) You realize, do you not, that those rules govern the way in which a criminal action is tried in [this] court?
(k) You realize, do you not, that if you decide to take the witness stand, you must present your testimony by asking questions of yourself? You cannot just take the stand and tell your story. You must proceed question by question through your testimony.
(l ) (Then say to the defendant something to this effect):
 I must advise you that in my opinion you would be far better defended by a trained lawyer than you can be by yourself. I think it is unwise of you to try to represent yourself.  You are not familiar with

(continued...)

The appellant herein primarily bases his argument on his opinion that the trial court failed to follow Smith and the guidelines. He concludes that the trial court's inadequate examination and inquiry prior to the determination of his ability to proceed pro se was not sufficiently extensive to ensure that his waiver of the right to counsel was knowingly and intelligently made.

According to the facts set forth in Smith, upon receiving notice that the defendant wanted to represent himself, the trial court affirmed that he had that right and provided him with copies of the indictments against him. Id. at 872. Later, when the defendant informed the trial court that he had negotiated a plea agreement and wanted to waive his right to a jury trial, the trial court asked him whether he was aware of his right to counsel and informed him that the court would appoint an attorney to assist with his defense if he could not afford one. The defendant waived those rights and restated his desire to proceed pro se. The trial court accepted his waiver of the rights to assistance of counsel and a jury trial, and then inquired as to his age, education, physical and mental health. Id. at 873. The defendant answered the questions and stated that he was not under the influence of any intoxicants, at the time of the crime or that particular moment. The trial court then advised the defendant of the maximum sentence length possible, found his guilty pleas voluntary, and imposed the agreed-upon sentences.

On appeal, a panel of this Court set aside the Smith defendant's conviction and remanded the cause for a new trial based on the conclusion that, under the existing guidelines, the trial court's pre-trial inquiry into the matter "should have been more extensive." Id. at 877. Specifically, the trial court's inquiry was found inadequate based upon the following: there were no warnings of the pitfalls of self-representation; the waiver was accepted without asking about the defendant's background, education, or experience with the court system; no questions were asked regarding his understanding of lesser offenses or the elements of the offenses charged; defendant was not asked whether he understood available defenses or the range of possible punishments; and, most importantly, the trial court failed to warn the defendant that self-representation was "unwise." Id. at 876.

---

[6](...continued)
the law. You are not familiar with court procedure. You are not familiar with the rules of evidence. I would strongly urge you not to try to represent yourself.
(m) Now, in light of the penalty that you might suffer if you are found guilty and in light of all of the difficulties of representing yourself, is it still your desire to represent yourself and to give up your right to be represented by a lawyer?
(n) Is your decision entirely voluntary on your part?
(o) If the answers to the two preceding questions are in the affirmative, [and in your opinion the waiver of counsel is knowing and voluntary,] you should then say something to the following effect:
"I find that the defendant has knowingly and voluntarily waived his right to counsel. I will therefore permit him to represent himself."
(p) You should consider the appointment of standby counsel to assist the defendant and to replace him if the court should determine during trial that the defendant can no longer be permitted to represent himself.

In the analogous case of State v. Northington, 667 S.W.2d 57 (Tenn. 1984), the Tennessee Supreme Court held that the trial court had "'wholly failed' to properly investigate [whether] the defendant understood the consequences of self-representation." Id. at 61. In Northington, the trial court discussed the seriousness of the charges; advised the defendant that, if he undertook to represent himself, he would be held to the same standard as a lawyer; ensured that the defendant had discussed the case with his appointed attorney; determined the age and education of the accused; and warned the defendant that proceeding pro se was unwise. Id. at 59. Notwithstanding these measures, the conviction was set aside because the trial court "failed to diligently examine the defendant's background and experience, failed to notify defendant as to the possible extent of any penitentiary sentence, and failed to elaborate fully to defendant why he thought it 'unwise' to waive counsel." Id. at 61.

In contrast, a panel of this Court found a valid waiver of the defendant's right to counsel in State v. Goodwin, 909 S.W.2d 35 (Tenn. Crim. App. 1995). In that case, the trial court inquired as to the defendant's age and education; warned him that proceeding pro se would cause confusion; informed him that an attorney would be provided to assist him with pretrial proceedings and throughout the appellate process, if necessary; and cautioned him that he would not have access to a law library and that his advisory counsel was not required to provide him with copies of relevant legal materials. Id. at 40. The trial judge further informed him that the trial would proceed at the same pace as it would if he had appointed counsel, that he would not have an opportunity to confer with advisory counsel for every question, and that he was responsible for understanding the rules of evidence and local rules of court. Id. at 41. As a litigant, the defendant in Goodwin was cautioned that he would have "no greater right than any other litigant," but treated the same as if he were represented by counsel. Id. On appeal, this Court found that the defendant had clearly demonstrated that "he knew what he needed to obtain to mount a defense and the problems that he would encounter." He had testified to previous experience with the judicial system and was also adamant that he represent himself at trial. Consequently, this Court concluded that Goodwin "clearly understood the hazards of representing himself," and that he had sufficient knowledge of what he was getting into to knowingly and intelligently waive his right to counsel. Id. at 40-41.

Looking at all of the above, the trial court in the case herein did not ensure that the waiver was made with an apprehension of the nature of the charges or of the lesser-included offenses included within them. The trial court merely stated the charged offenses and asked the appellant if he understood what he was charged with in the indictment. The trial court also did not discuss the range of allowable punishments. The trial court did not go over the specific elements of the charged offenses or any lesser-included offenses. In addition, the pre-trial inquiry contains no discussion of possible defenses to the charges or of what circumstances may be considered in mitigation thereof. In short, the inquiry which should enable the judge to "make certain that an accused's professed waiver of counsel is understandingly and wisely made," fell short of being "penetrating and comprehensive of all the circumstances under which such a plea is tendered." Von Moltke v. Gillies, 332 U.S. 708, 723-24 (1948).

Comparing existing precedent to the case herein, we conclude that the trial court's inquiry more closely resembles the probes conducted in Northington and Smith, rather than Goodwin. First and foremost, there were no warnings given to the appellant concerning the "pitfalls" of self-representation. Thus the appellant was not sufficiently apprised of the hazards involved in such an undertaking. The trial court herein did not inform the appellant as to precisely what types of hurdles he would encounter, as in Goodwin; the trial court herein merely wished the appellant "good luck." The trial judge pointed out that appointed counsel had the necessary experience to conduct cross-examination and was schooled in the intricacies of the legal profession. The trial court did inform the appellant that he could "participate to any extent that you want to or you can let . . . [appointed counsel] participate to whatever extent you want him to."

As for the inquiry into the appellant's background, education, and experience with the court system, the trial court's questions were far from diligent. At the initial hearing where the trial court granted the motion to proceed pro se, the trial court did not inquire as to the appellant's age or education and merely asked if he was "schooled" in the law. The appellant replied that he was and the trial court granted the motion, allowing the appellant to represent himself with the assistance of counsel. At the hearing immediately prior to voir dire, as in Northington and Smith, no questions were asked regarding his understanding of lesser offenses, the elements of the offenses charged and their lesser-included offenses, the defenses available to him, or the range of possible punishments.

If the appellant herein had represented himself pro se in the traditional sense, totally and completely without the aid of counsel, our inquiry herein would end and our decision would most surely require reversal of the conviction and a remand for a new trial where the appellant would either be represented by counsel or where the trial court would secure a proper knowing and intelligent waiver from the appellant prior to allowing him to proceed pro se. However, the appellant in the case herein was allowed to represent himself while having the benefit of an intelligent and qualified attorney at his disposal as the trial court approved a "hybrid" representation.

This case is somewhat similar to State v. Franklin, 714 S.W.2d 252 (Tenn. 1986), in which the defendant, who was represented by counsel, demanded and was permitted to make a closing statement to the jury along with the arguments of two court-appointed attorneys. In Franklin, the supreme court was called upon to determine whether the defendant had knowingly waived his right to counsel and whether the trial court abused its discretion in allowing the defendant to address the jury. Id. at 253. The court commented that "the question of waiver does not necessarily arise when a defendant is in fact represented by counsel at every stage of his prosecution" and determined that the determinative issue was whether the trial court abused its discretion in permitting hybrid representation. Id. at 258. After reviewing the record, the court determined that the circumstances justified the exercise of the trial court's discretion.

In Franklin, the court pointed out that the issue of waiver is pretermitted in cases of hybrid representation, where the trial court has the discretion to permit such participation of a defendant in exceptional circumstances. Id. at 259 (citing Burkhart, 541 S.W.2d at 371-72). The court noted the

case by case nature of hybrid representation cases and pointed out that, in order to determine whether hybrid representation is proper:

> [N]ot only must the trial court make the threshold determinations (1) that defendant is not seeking to disrupt the trial, and (2) that the defendant has the intelligence, ability and general competence to participate in his own defense, but the trial court must also ensure (3) that the circumstances are so exceptional as to justify the defendant's request, which circumstances must be made to appear on the record, (4) that defendant has the opportunity to confer with counsel out of the presence of the jury prior to his participation, (5) that, out of the presence of the jury, the defendant is instructed that he may not state facts not in evidence, and (6) that the defendant and the jury are instructed that the defendant is acting as his own counsel and that the defendant is not giving any evidence or testimony. Even where all these factors could be present, the trial court may nevertheless decline to permit hybrid representation. We believe that only rarely will circumstances justify the exercise of this discretion, but a defendant has no absolute right to hybrid representation or to make an unsworn statement before the jury.

Id. at 260-61.

In this case, having reviewed the record of the trial, we are of the opinion that the circumstances justified the exercise of the trial court's discretion, and we will not second-guess the decision of the trial court on this record. We are aware that trial courts "cannot freely exercise such discretion absent circumstances justifying such an unusual action as permitting hybrid counsel." Id. at 261. However, looking to the record, the trial court wisely preserved its reasons for permitting the hybrid representation, stating:

> In this case. . . [the appellant] was represented by . . . [appointed counsel]. . . . [Appointed counsel] represented . . . [the appellant] throughout the entire proceeding, to include pretrial matters and the trial itself. The trial courts are urged to exercise the discretion sparingly and with caution when hybrid representation is permitted. The case law requires that there have been sufficient reasons expressed and that those reasons appear in the record. . . . [The appellant] - - and the record is clear going through the entire record, . . . [the appellant] insisted on representing himself. He filed numerous papers pretrial, he told the Court on repeated occasions he wanted to represented [sic] himself.

> And the circumstances that prompted the Court to allow him to represent - or be represented in a hybrid fashion was the knowledge that the Court had, which was acquired from . . . [the appellant's] actions in court, that . . . [the appellant] was going to be a very difficult defendant, disruptive, if he did not participate in his own defense.

As it turned out . . . [the appellant] did a good job. . . . [Appointed counsel] participated in certain stages of the trial as did . . . [the appellant]. . . . [The appellant] examined witnesses. He did a good job and the record will bear that out. The fact that hybrid representation was the means by which this Defendant came to trial is clear and justified by the record in this Court's view.

This Court has the discretion to permit it. This Court did permit it. It was done because of . . . [the appellant's] attitude, and the way he presented himself in court, and his repeated request and his repeated insistence that he represent himself.

The trial court had the discretion to permit hybrid representation. Franklin, 714 S.W.2d at 259. At no time was the trial court required to recall order to the court due to the appellant's behavior. The appellant often conferred with his attorney and allowed appointed counsel to argue the motion for judgment of acquittal and make the closing arguments. The trial court instructed the appellant as to his duties as an advocate for himself and properly instructed the jury on the appellant's role as well. We cannot say that, in the circumstances of this trial, that the trial court abused its discretion in allowing the appellant to represent himself with the assistance of counsel. This issue is without merit.

Sufficiency of the Evidence

The appellant next contends that the proof is not sufficient to sustain the convictions, but the appellant does not dispute that the elements of the crime were established at trial. Instead, the appellant argues that the testimony of accomplice Helen Trotter was not independently corroborated and that, without this testimony, he could not be convicted. The State counters that the evidence is sufficient to corroborate the accomplice testimony of Helen Trotter and to support the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim.

App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

Because the appellant challenges the sufficiency of the evidence on the basis that the accomplice testimony was not corroborated, we begin our analysis by acknowledging the well-settled law of this state that convictions may not be based solely upon the uncorroborated testimony of accomplices. See State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. See State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that:

> The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811, 814 (Tenn. 1959)). In addition, our courts have stated that:

> The evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

Griffis, 964 S.W.2d at 589. Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. See id. at 588; State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997).

After reviewing the record herein, we find sufficient corroboration of the accomplice testimony of Ms. Trotter to uphold the appellant's convictions. Ms. Trotter testified that she went to the victim's apartment with the appellant and knocked on the door as the appellant instructed her to do. When no one answered the door, they left for a few minutes, and then came back. Ms. Trotter testified that she and the appellant walked up the sidewalk from the parked white Cadillac and that the appellant then broke the apartment house window in order to gain entry.

Joe Allen Martin, a resident of the area, corroborated Ms. Trotter's testimony by testifying that he saw a white female and a black male in the early morning hours walking down the sidewalk in front of the apartment house. Ms. Trotter testified that while at the victim's apartment house, she heard a door being kicked in and heard the appellant say, "Bitch, where is the money" two or three times. Ms. Trotter heard a muffled pop and was assured by Mr. Merriweather that it was "just a gunshot."

After the gunshot, Ms. Trotter heard scuffling and fighting on the second floor. She heard the appellant say, "He's got a gun." She then heard five more shots and what sounded like a woman screaming and hollering for help. She heard what she thought was a body hit the floor, so she went to the car. Ms. Trotter further testified that once in the car, she heard the appellant talk about how he shot the victim.

Ms. Trotter further testified that after the victim was shot, she and the appellant went back to her apartment. Not long thereafter, the appellant told Ms. Trotter that he wanted to make a telephone call so the two walked to a nearby payphone. Shawn Dowlen, the appellant's first cousin, testified that he received a telephone call from the appellant around that same time, but denied talking to the appellant. Telephone records substantiated Ms. Trotter's claims. Taken together, even though the testimony of these various witnesses does not corroborate every portion of Ms. Trotter's testimony, it gives credence to portions of Ms. Trotter's testimony which tend to connect the appellant with the commission of the crimes. See Griffis, 964 S.W.2d at 589.

Again, the jury is the primary instrument of justice responsible for determining the weight and credibility to be given to the testimony of the witnesses. Cabbage, 571 S.W.2d at 835. Conflicts in that testimony are matters that are entrusted exclusively to the trier of fact and not this Court. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Looking at the verdict, it is clear that the jury found sufficient corroboration of Helen Trotter's testimony. While not overwhelming, we determine that the jury was presented with sufficient evidence with which to convict the appellant.

Prosecutorial Misconduct

Finally, the appellant argues that the State committed prosecutorial misconduct by "proffering" the false testimony of Leonia Sanders. Specifically, the appellant contends that because the State had prior contact with Ms. Sanders and was aware of her history of lying under oath, the State should have known that she was lying at trial. The State argues that the trial court properly found that the State did not commit misconduct by offering perjured testimony because there is no proof that the State knew the testimony was false.

At trial, Leonia Sanders testified that she had known the appellant for approximately twelve years. She claimed that in September of 2000, not long after the victim's death, the appellant came to her house and told her that he shot the victim. On cross-examination, the appellant attempted to question Ms. Sanders' claims by utilizing a letter written by her to the appellant in which she asked him if he killed the victim. The letter was written after Ms. Sanders claimed the conversation took

place in which the appellant admitted to killing the victim. The letter was not introduced into evidence.

At the hearing on the appellant's motion for new trial, appointed counsel for the appellant asked Ms. Sanders under oath if the appellant ever told her that he killed the victim. She testified that the appellant never told her that he killed the victim. Ms. Sanders claimed that she "was lying" when she testified at trial. Ms. Sanders also professed her love for the appellant and claimed that she had lied to the same investigators after being questioned about a different murder several years earlier.

It is without question that the State may not present false testimony and that it has an affirmative duty to correct false testimony presented by State's witnesses. State v. Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). To obtain a new trial, the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material. State v. Ricky Alexander Nabors, No. 02C01-9404-CC-00065, 1994 WL 716247, at *2 (Tenn.Crim. App. at Jackson, Dec. 28, 1994). Further, we note that the trial court properly charged the jury that Ms. Trotter was an accomplice, ergo the jury had to find corroboration, other than Leonia Sanders' testimony, of the appellant's actions.

Nothing in the record suggests the State knew that the testimony of Ms. Sanders was false at the time she testified at trial and therefore knowingly introduced false testimony. This issue is without merit.

<u>Conclusion</u>

For the forgoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE