# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 4, 2011

## STATE OF TENNESSEE v. SHEDDRICK HARRIS

### Appeal from the Criminal Court for Shelby County
No. 09-00594     Chris Craft, Judge

---

### No. W2010-02512-CCA-R3-CD  - Filed January 5, 2012

---

The defendant, Sheddrick Harris, appeals his Shelby County Criminal Court jury convictions of first degree felony murder, *see* T.C.A. § 39-13-202(a)(2) (2006), and especially aggravated robbery, *see id.* § 39-13-403.  At the penalty phase of the trial, the jury found two enhancement factors beyond a reasonable doubt: "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person," *see id.* § 39-13-204(i)(2); and "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, any . . . robbery," *see id.* § 39-13-204(i)(7), and it unanimously imposed a sentence of life imprisonment without the possibility of parole, *see id.* § 39-13-204(f)(2).  At a separate sentencing hearing concerning the especially aggravated robbery conviction, the trial court sentenced the defendant to 60 years' incarceration as a career offender to be served consecutively to the life without parole sentence.  In addition to challenging the sufficiency of the evidence to support his conviction of first degree felony murder, the defendant contends that the trial court erred by (1) imposing increased security procedures during trial, (2) denying his motion for mistrial, (3) limiting his cross-examination of a witness, and (4) excluding residual doubt evidence from the penalty phase of the trial.  Discerning no paucity of evidence and no error, the judgments of the criminal court are affirmed.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Juni Ganguli, Memphis, Tennessee, for the appellant, Sheddrick Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William B. Gibbons, District Attorney General; Alanda Dwyer and Abby Wallace,

Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant's convictions arise from an ill-fated drug deal turned robbery during which the victim, Corey Lester, suffered the theft of over $10,000 and a fatal gunshot wound to his chest. The victim's sister, Deborah Montgomery, testified that authorities found her 38-year-old brother shot to death in his Memphis home on May 20, 2008.

Derron Macklin had known the victim "about a year" and considered the victim a friend. On May 20, 2008, Mr. Macklin and another individual, Rockie Hilliard, met with the victim at a Memphis Marshall's department store to arrange a drug deal with the defendant, whom Mr. Macklin knew as "Sed." As Mr. Macklin explained, "[Mr. Hilliard] knew where some drugs w[ere] and that [the defendant] want[ed] to see the money first." Mr. Macklin, however, became nervous about the drug deal because "who in their right mind is going to show you the money first without seeing the product." After arranging a meeting between the victim and the defendant for later that day, Mr. Macklin telephoned the victim and told the victim that he was not "comfortable with what was fixing to go down" and attempted to call off the transaction. The victim, however, told Mr. Macklin that he would "go through" with the meeting.

Mr. Macklin and Mr. Hilliard picked up the defendant at a Fred's store and drove to a Shell station near the victim's home. The victim had told Mr. Macklin that he did not want Mr. Hilliard to come to his home because Mr. Hilliard had been recently paroled from federal prison. Therefore, Mr. Macklin, Mr. Hilliard, and the defendant met the victim at the Shell station, where the defendant and Mr. Macklin got into the victim's white pickup truck and went to the victim's home.

When they arrived at the victim's home, Mr. Macklin went into a living room area and began "racking up" a game of pool at the victim's pool table. The defendant received a phone call and "his whole attitude changed." The defendant demanded to see the money, so the victim "brought out a little black pouch" containing money and placed it on the kitchen table. The defendant became angry over the amount of money presented. When the victim said, "[T]hat's all the money I got," the defendant shot the victim in the leg. The defendant then asked for "the rest of the money." When the victim told him that the money was "back there" in the victim's bedroom, the defendant directed Mr. Macklin to retrieve the money from the victim's bedroom dresser. Mr. Macklin went to the victim's bedroom and returned with another small container of money.

Next, the defendant ordered the victim and Mr. Macklin to the living room

-2-

couch. The defendant forced the victim and Mr. Macklin to "strip down to [their] underwear" and told them that he was "going to have to . . . kill [them]." Both men begged for their lives. When the defendant telephoned someone but got no answer, the victim offered the defendant any of his vehicles in return for leaving them without any further harm. The defendant instructed Mr. Macklin to dress and go start one of the vehicles – either a white pickup truck or a Corvette. The defendant stood in the doorway of the home, watching both the victim and Mr. Macklin, as Mr. Macklin walked outside to start the victim's white pickup truck. Mr. Macklin "got around the truck [and] stuck the key in the ignition[, but] it didn't fit. So [he] laid down and ran."

Mr. Macklin fled the victim's driveway and ran door to door seeking help. Unable to summon any help from neighbors, Mr. Macklin went to the Shell station where he telephoned Vincent Halliburton to warn him of what had occurred because Mr. Halliburton was on his way to the victim's home. Mr. Macklin then telephoned 9-1-1 to report the shooting and returned to the victim's home to meet the police.

As Mr. Macklin walked back to the victim's home, he saw the defendant and Mr. Hilliard in Mr. Hilliard's car. When Mr. Hilliard and the defendant saw Mr. Macklin, "they hit the brakes so [he] just stepped over in the bushes and then they left." When Mr. Macklin returned to the victim's home, Mr. Halliburton was already standing outside. Mr. Macklin told Mr. Halliburton that he and the victim had been robbed. Mr. Macklin looked inside the door and saw the victim lying on his back by the pool table.

The police soon arrived, and Mr. Macklin gave them a statement during which he "tried to shy away" from discussion of the drugs because he did not want to be charged in any conspiracy concerning the drugs. Later at the police station, however, Mr. Macklin admitted to police that he had been untruthful at the scene and "told them everything [he] knew at that point," including identifying the defendant as the shooter. He testified, "I told [the police] that . . . we [were] there to buy drugs and we [were] getting them from [the defendant] and he pulled up a gun and robbed us." Mr. Macklin only witnessed the defendant's firing the first shot in the victim's leg, did not see any other shots fired, and did not see the drugs at any time. At trial, Mr. Macklin denied visiting the defendant's home on the day of the shooting.

Rocky Hilliard had known the defendant approximately six to 12 months at the time of the shooting. He met the victim for the first time on May 20, 2008. Mr. Hilliard assisted Mr. Macklin in setting up the drug deal by getting Mr. Macklin in touch with the defendant. Mr. Hilliard also expressed some reservations about the deal and told Mr. Macklin and the victim to "leave it alone." Mr. Hilliard testified that when he and Mr. Macklin picked up the defendant at the defendant's home, Mr. Macklin went inside the

defendant's home for "maybe five minutes" before both men came outside and got into Mr. Hilliard's car. Mr. Hilliard recalled that the defendant carried a large "dark black" bag to the car, which he assumed contained drugs. Mr. Hilliard drove the men to the Shell station to meet the victim and waited at a "wing place" restaurant near the Shell station while the men went to the victim's home.

Mr. Hilliard spent 30 to 40 minutes "just sitting" at the restaurant while the men were at the victim's home. At one point, he telephoned the defendant to ask what was taking so long, and the defendant told him that they were about to test the drugs. Some time later, Mr. Macklin telephoned Mr. Hilliard, told him "you set us up," and hung up the phone. Soon thereafter, the defendant telephoned Mr. Hilliard for a ride and told Mr. Hilliard that the victim and Mr. Macklin were "trying to rob" him. Mr. Hilliard picked up the defendant on a nearby street and took him home. On the trip to the defendant's home, the defendant repeatedly told Mr. Hilliard that the other men had tried to rob him.

Mr. Hilliard left the defendant at the defendant's home and traveled alone to Tunica, Mississippi. A Memphis Police Department (MPD) detective telephoned Mr. Hilliard in Tunica to ask him who killed the victim. Mr. Hilliard was "shocked" to learn of the victim's death. The next morning and while accompanied by his attorney, Mr. Hilliard gave a statement to the detectives and identified the defendant from a photographic lineup.

Torrie Reed, an employee at the victim's automotive shop, went to the victim's home on the night of May 20, 2008, to have the victim sign his probation papers. He arrived to find both of the victim's vehicles in the driveway, but no one answered the door. Mr. Reed entered the home and found bullet casings and clothing on the floor and the victim's body lying near the pool table. He approached the victim to check his pulse. When the victim did not move, he ran to a neighbor's house to telephone 9-1-1. After making the telephone call, he returned to the victim's house to find Mr. Halliburton there. They both waited for the police to arrive.

MPD Officer Robert Harris arrived at the victim's home at approximately 9:45 p.m. to find the victim lying lifelessly on the floor in a puddle of blood. He checked the inside of the home for the presence of other individuals, secured the scene, and waited for detectives to arrive.

Javier Bailey, Mr. Hilliard's attorney, received a telephone call from Mr. Hilliard in the "wee hours of the morning" of May 21, 2008. He agreed to meet Mr. Hilliard at his office and accompany him to the MPD station later that morning. Mr. Hilliard gave a statement to MPD detectives.

MPD Detective Charles Teeters, a member of the Drug Response Team, arrived at the victim's home after the victim's body had been removed. Detective Teeters observed what appeared to be a "sizeable amount of cocaine" on the kitchen counter. He determined the substance to be approximately two kilos of cocaine based upon its appearance and packaging. When Detective Teeters sampled the substance, however, the substance did not have "the normal texture" of cocaine. Detective Teeters performed a field test of the substance that produced no "positive test for cocaine." Later testing at the property room confirmed that the substance was not cocaine. Detective Teeters, however, recovered a small amount of cocaine from a saucer on the kitchen counter.

MPD Detective Alpha Hanks processed the crime scene. She noted spent shell casings that were found in the front doorway, in a kitchen garbage can, and behind the living room couch. Detective Hanks also documented a blood trail leading from the kitchen to the victim's body near the pool table. She discovered bullet holes in the couch and one bullet hole in a pair of blue jeans. She collected blood samples for deoxyribonucleic acid (DNA) testing as well as five spent .380 casings and two spent bullets for ballistics testing.

At approximately 7:30 a.m. on May 21, 2008, Robert Lambe sold the defendant his 1998 black Cadillac DeVille. The defendant paid Mr. Lambe $4,900 cash, and Mr. Lambe gave the defendant a bill of sale and title transfer. Mr. Lambe testified that he had removed all of his personal property from the vehicle prior to putting it up for sale three weeks earlier. He did not leave over $13,000 in cash in the vehicle or a Lorcin .380 pistol in the glove compartment.

MPD Detective Michael Garner worked with the Investigative Support Unit and was responsible for apprehending individuals on "probable cause pickups." He arrested the defendant at a Memphis muffler shop on May 21, 2008. The defendant did not immediately submit, but when cornered by Detective Garner and his team, the defendant "gave up." The defendant told Detective Garner that he did not have a vehicle at the shop. The defendant, however, held a set of keys in his hand at his arrest. The officers confirmed the keys belonged to a black Cadillac DeVille parked on the lot. A plain view search of the vehicle uncovered paperwork relevant to the defendant's recent purchase of the car that morning. MPD Detective Samuel McMinn assisted Detective Garner in the defendant's arrest. He testified at trial consistently with Detective Garner's testimony concerning the circumstances of the defendant's arrest and search of the vehicle.

MPD Detective Barry Hanks was one of the first detectives at the scene on the night of May 20, 2008. He recovered the victim's wallet from the master bedroom. It contained approximately $500. Detective Hanks returned to the scene the next morning to ensure nothing had been overlooked in the darkness. He then discovered a Corvette key in

the driveway underneath the victim's white pickup truck.

Detective Hanks prepared the search warrant for the search of the defendant's vehicle and conducted the search. He discovered paperwork concerning the defendant's ownership of the vehicle and receipts showing the defendant's payment of fines on the morning of May 21 in order to have his driving privileges reinstated. Detective Hanks acknowledged that he had averred in the search warrant affidavit that no money was recovered at the victim's residence. He explained that he "did not even think about the five hundred dollars" found in the victim's wallet when preparing the affidavit.

MPD Sergeant James K. Smith processed the defendant's vehicle. He discovered two boxes containing a large amount of money in the back seat and a handgun in the glove compartment.

Shelby County Medical Examiner Doctor Miguel Laboy performed the autopsy of the victim. He determined that the victim suffered gunshot wounds to the left side of his chest, his left knee, and his right knee. The bullet to the victim's left knee traveled up the victim's leg and lodged in his left buttock, where Doctor Laboy recovered it. Likewise, Doctor Laboy recovered the bullet in the victim's chest from the soft tissue of the victim's back. The bullet that struck the right knee, however, exited out the back of the victim's leg. The chest wound perforated the victim's lung, heart, pulmonary artery, and right side of his "wind pipe." The extensive damage from the chest wound caused profuse amounts of blood to flow from the victim's mouth, giving the appearance that the victim had suffered a head wound. Doctor Laboy opined that the chest injury was not survivable.

Tennessee Bureau of Investigation (TBI) Special Agent Laurence James performed DNA analysis on items collected from the crime scene and the defendant's vehicle. Testing of all of the blood samples taken at the scene revealed the blood to be that of the victim. Special Agent James was unable to obtain any DNA evidence from the pistol recovered from the defendant's vehicle.

Special Agent Raymond DePriest, a firearms examiner, determined that the Lorcin .380 semi-automatic pistol recovered from the defendant's vehicle was "fully functional." Through his examination of the shell casings and bullets recovered at the scene, he determined that they all were consistent with having been fired from the pistol. Likewise, he determined that the bullets recovered from the victim's body had been fired from the same pistol.

With this evidence, the State rested its case. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, *see Momon v.*

*State,* 18 S.W.3d 159, 161-62 (Tenn. 1999), the defendant elected not to testify. The defendant's brother, Louis Harris, testified that he had employed the defendant as security at his club "a little bit after [the defendant came] out of the halfway house." He paid the defendant $75 nightly, and the defendant worked four or five nights each week. Mr. Harris recalled telling the police in his May 23 statement that the defendant left the club on the night of May 20 with an "albino guy" to go see Mr. Hilliard. In his statement to the police, Mr. Harris said that whenever "them guys" got together they were always "up to nothing no good."

Following deliberations, the jury convicted the defendant, as charged, of the first degree felony murder and especially aggravated robbery of the victim.

At the penalty phase, the State presented evidence of the defendant's prior federal convictions of conspiracy to commit murder in retaliation against a witness, attempted murder of a witness, threatening a witness with bodily injury, and retaliatory assault of a witness's wife for which he received a 240-month sentence followed by three years' supervised release. Federal Probation Officer Lorin Smith testified that the defendant remained on supervised release when the present offenses were committed. Shelby County Criminal Court Deputy Clerk Christy Dye testified that the defendant had prior state convictions of aggravated rape, robbery with a deadly weapon, aggravated kidnapping, and two counts of aggravated assault. The defendant elected not to testify at the penalty phase of the trial.

Based upon this evidence, the jury found beyond a reasonable doubt that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person," *see id.* § 39-13-204(i)(2); and that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, any . . . robbery," *see id.* § 39-13-204(i)(7), and it unanimously imposed a sentence of life imprisonment without the possibility of parole for the first degree murder conviction, *see id.* § 39-13-204(f)(2). At a separate sentencing hearing, the trial court sentenced the defendant as a career offender to 60 years' imprisonment for the especially aggravated robbery conviction. Timely post-trial motions followed and were denied by the trial court. The defendant timely filed a notice of appeal. This case is properly before this court.

On appeal, the defendant argues that the evidence is insufficient to support his conviction of first degree murder, that the trial court erroneously employed enhanced security procedures during the trial, that the trial court erred by denying his motion for a mistrial, that the trial court improperly limited cross-examination concerning the preparation of the search warrant, and that the trial court improperly excluded residual doubt evidence at the penalty

phase of the trial. The State contends that the evidence is sufficient and that the trial court committed no error. We will address each claim in turn.

*Sufficiency of the Evidence*

The defendant argues that the evidence is insufficient to support his conviction of first degree felony murder because the only eyewitness testimony tying him to the shooting came from Mr. Macklin, who he contends was an accomplice, and that Mr. Macklin's testimony was not sufficiently corroborated by other evidence. The State argues that Mr. Macklin was not an accomplice and that the evidence sufficiently established the defendant's culpability.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing

the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963) (citations omitted).

This court has observed that "[a]n accomplice is defined as one who 'knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument.'" *State v. Tyree Robinson*, W2008-01001-CCA-R3-CD, slip op. at 8 (Tenn. Crim. App., Jackson, June 16, 2009) (quoting *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997), *perm. app. denied* (Tenn. Nov. 23, 2009)). The determination of whether a witness is an accomplice focuses upon "whether the witness could be indicted for the same offense as the defendant." *Id.* (citing *State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995)).

In our view, the evidence did not establish that Mr. Macklin "knowingly, voluntarily, and with common intent" participated with the defendant in the felony murder and especially aggravated robbery of the victim. Indeed, the evidence established that but for his escape from the victim's residence, Mr. Macklin also may have fallen victim to the defendant's shooting. Accordingly, we agree with the State that Mr. Macklin was not an accomplice. Consequently, it was not necessary that Mr. Macklin's testimony concerning the offenses be corroborated.

Tennessee Code Annotated section 39-13-202(a)(2) provides that first degree murder is "[a] killing of another committed in the perpetration of . . . any . . . robbery." T.C.A. § 39-13-202(a)(2) (2006). The evidence established that the defendant engaged the victim in a drug deal. When the victim produced money for the purchase of the drugs that the defendant believed to be insufficient, the defendant became angry, brandished a pistol, and demanded more money. Upon receiving the additional money, the defendant voiced his intention to kill both the victim and Mr. Macklin. Within one day of the victim's death, authorities arrested the defendant and discovered a large amount of cash and the murder weapon in the defendant's newly-purchased vehicle. We conclude that sufficient evidence supports the defendant's conviction of first degree felony murder.

*Security Procedures*

The defendant argues that the trial court erred by granting the State's motion to utilize extraordinary security procedures during the trial. He specifically argues that the trial court's implementation of additional law enforcement personnel outside and within the courtroom and an additional metal detector at the entrance to the courtroom "created the impression that [the defendant] is dangerous" and violated his right to a fair trial. The State responds that the additional measures utilized by the trial court were a necessary response to concerns raised by local law enforcement personnel and that the measures did "not negatively affect the defendant's ability to receive a fair trial."

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the United States Supreme Court defined the standard by which security presence in the courtroom may be measured in relation to a defendant's constitutional right to a fair trial. In reviewing a petition from a defendant convicted in a Rhode Island state court, the Supreme Court concluded that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not an inherently prejudicial practice and does not violate the fundamental principles of the criminal justice system. *Id.* at 568. When a courtroom security arrangement is challenged as inherently prejudicial, the question is whether there is "an unacceptable risk . . . of impermissible factors coming into play." *Id.* at 570.

*Holbrook* involved a challenge to four uniformed officers' sitting behind six defendants. In finding the defendants were not entitled to relief, the Supreme Court stated:

> We do not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial. But we simply cannot find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section. Even had the jurors been aware that the deployment of troopers was not common practice in Rhode Island, we cannot believe that the use of the four troopers tended to brand respondent in their eyes with an unmistakable mark of guilt. Four troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings.

*Id.* at 571 (citations and internal punctuation omitted).

As the Supreme Court has recognized, "[J]urors are quite aware that the

-10-

defendant appearing before them did not arrive there by choice or happenstance." *Id.* at 567. Generally, the trial court, which has presided over the proceedings, is in

> the best position to make determinations regarding how to achieve [the] primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshaling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried.

*State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986). The use of security personnel has also been justified as a necessary measure to prevent escape, to protect those present in the courtroom, and to maintain order during the trial. *Illinois v. Allen*, 397 U.S. 337 (1970); *Woodards v. Cardwell*, 430 F.2d 978 (6th Cir. 1970); *State ex rel. Hall v. Meadows*, 389 S.W.2d 256 (1965).

In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court addressed the propriety of shackling a defendant in a courtroom and held that

> courts cannot routinely place defendants in shackles or other physical restraints visible to the jury. . . . The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling.

*Id.* at 633. In this regard, the Supreme Court recognized the need to restrain dangerous defendants to prevent courtroom attacks and the need to give trial courts latitude in making individualized security determinations. *Id.* at 632. The Court also acknowledged the potential for tragedy that can result if judges are not able to protect themselves and their courtrooms. *Id.* The Court advised, however, that such determinations must be case specific; "that is to say, it should reflect particular concerns, say special security needs or escape risks, related to the defendant on trial." *Id.* at 633. Thus, the Court concluded that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." *Id.* at 632.

In *State v. Robert Hood*, No. W2004-01678-CCA-R3-DD (Tenn. Crim. App., Jackson, Sept. 13, 2005), this court concluded that "the holding in *Deck v. Missouri* is a reasonable rule that should be applied to any restraint imposed on a criminal defendant in the courtroom." *Robert Hood*, slip op. at 19. In the present case, the State presented evidence at a pretrial hearing that the defendant had been previously convicted of federal offenses

-11-

involving witness intimidation and retaliation; that he had been previously convicted of escape; and that he had been previously convicted of the aggravated rape of a witness's wife. The State presented additional evidence that the defendant had attempted to murder another inmate while incarcerated, prompting his placement at the maximum security federal prison in Leavenworth, Kansas. In summary, the State asserted that the defendant had a "horrible record for crimes of violence." The trial court, with reference to possible gang activity not specifically tied to the defendant, remarked that the "security that we have in this [courthouse] is terribly lax." The court determined to place two extra deputies and an additional metal detector checkpoint at the entrance to the courtroom, three extra deputies inside the courtroom, and additional deputies with the sequestered jury and reasoned that "[the defendant] has been convicted of intimidating witnesses in the past. He may have some friends that were going to be doing that. So I am not saying that he is innocent or guilty of these [allegations], but we're going to make sure that everybody is safe, including [the defendant]."

In our view, the trial court considered the particular circumstances presented in this case and took appropriate measures to protect all the participants in the trial. Moreover, the defendant did not establish that the increased security measures utilized by the trial court prejudiced his trial. *See State v. Taylor*, 771 S.W.2d 387, 396 (Tenn. 1989) (holding that defendant under guard in courtroom was not prejudiced). Accordingly, we conclude that the trial court did not abuse its discretion by imposing additional security measures in the courtroom.

*Mistrial*

Next, the defendant contends that the trial court erred by denying his request for a mistrial prompted by, as characterized by the defendant, Detective McMinn's reference to the defendant's "prior criminal history." The State argues Detective McMinn's comment was not intentionally elicited by the State and quickly mitigated by further testimony; thus, manifest necessity did not exist to warrant the granting of a mistrial.

Whether to grant a mistrial is an issue entrusted to the sound discretion of the trial court. *See State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). The burden of establishing the necessity for mistrial lies with the party seeking it. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, we have often considered (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the State's

proof, and (3) whether the trial court promptly gave a curative instruction. *See State v. William Dotson*, No. 03C01-9803-CC-00105, slip op. at 9 (Tenn. Crim. App., Knoxville, June 4, 1999).

The record reveals that, during Detective McMinn's testimony concerning the circumstances of the defendant's arrest, Detective McMinn said, "We had [the defendant's] most recent booking photo with us, or his driver's license photo, it was a picture of him [,and we r]ecognized him walking out" of the muffler shop. Detective McMinn then completed his direct testimony without any contemporaneous objection by the defendant. Prior to cross-examination, the defendant requested a mistrial, arguing that Detective McMinn's "blurt[ing] out" that the defendant had a prior criminal history prejudicially inflamed the jury against him. The State argued that Detective McMinn mitigated the effect of the remark with the additional comment regarding "his driver's license photo" and that, at most, a curative instruction may be warranted. The trial court ruled that there was actually no reference to the defendant's criminal history; that "[j]ust the word booking is not something that would inflame the jury"; and that, therefore, the defendant failed to establish manifest necessity to require a mistrial. The court then offered to issue a curative instruction. The defendant, however, declined the court's offer of a curative instruction.

In our view, the defendant's failure to object contemporaneously to the comment could operate as a waiver of this issue. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection if the specific ground is not apparent from the context."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error."). That being said, we agree with the trial court that the brief and vague reference to the defendant's "booking photo" did not inflame the jury, particularly in light of the evidence presented concerning the identification of the defendant via a photographic lineup, Detective Hanks's testimony concerning the defendant's efforts to have his driver's license reinstated on the morning after the shooting, and Louis Harris's testimony, which was elicited by the defendant, concerning the defendant's recent release from a halfway house. The comment was not intentionally elicited by the State, it was mitigated by the witness's additional testimony, and the State's proof was strong. Furthermore, the defendant declined the trial court's offer of a curative instruction. We conclude that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial.

-13-

The defendant argues that the trial court impermissibly limited his cross-examination of Detective Hanks concerning alleged misstatements in the affidavit in support of the search warrant for the defendant's vehicle. The State argues that the validity of the search warrant was not at issue during trial and that, in fact, the trial court permitted cross-examination concerning inaccurate statements made in the affidavit by Detective Hanks.

To be sure, the propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. *See State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn. 1994); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). Absent a clear abuse of this discretion that results in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984). In addition, "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b).

During Detective Hanks's cross-examination, defense counsel attempted to elicit testimony regarding what another officer may have told Detective Hanks that was contrary to the facts averred in the search warrant affidavit in an effort to prove that parts of the affidavit were false. The State objected on the basis that the defendant should have challenged the veracity of the search warrant affidavit via a pretrial motion to suppress. The trial court sustained the State's objection and ruled

> I'm not going to allow you to try to impeach testimony he gave
> in the search warrant.
> . . . .
> You can ask questions about the search – if what he said in the
> affidavit is different than what he's saying now, you can try to
> impeach him with a prior inconsistent statement. But if you're
> saying what someone else told him is different than what he put
> in the warrant, that warrant is not at issue right now, only his
> testimony in court.

Defense counsel then impeached Detective Hanks's testimony with discrepancies between his testimony at trial and averments in the affidavit.

In our view, the trial court correctly ruled that evidence of any discrepancies between information told to Detective Hanks and the information included in the affidavit for the search warrant was not relevant to impeach the witness's testimony at trial. The

veracity of the search warrant was not at issue. The credibility of the witness, however, was at issue and to that end, the trial court appropriately limited cross-examination to discrepancies between the facts averred in the search warrant affidavit and those testified to by the witness at trial. Accordingly, we discern that the trial court committed no abuse of discretion in limiting the cross-examination of Detective Hanks.

*Residual Doubt Evidence*

In his final allegation of error, the defendant contends that the trial court erred by excluding residual doubt evidence during the penalty phase of his trial. The State contends that the purported evidence was not probative of residual doubt and properly excluded.

"Residual doubt evidence refers to proof that the defendant did not commit the murder and that, notwithstanding the jury's verdict of guilt, may raise some lingering or residual doubt in the jury's mind about the defendant's culpability and which may act as a mitigating circumstance with respect to punishment." *State v. Kiser*, 284 S.W.3d 227, 259 (Tenn. 2009) (citing *Franklin v. Lynaugh*, 487 U.S. 164, 188 (1988) (O'Connor, J., concurring) ("'Residual doubt' is not a fact about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between beyond a reasonable doubt and absolute certainty."); *State v. Hartman*, 42 S.W.3d 44, 57 (Tenn. 2001) ("By definition, residual doubt is established by proof that casts doubt on the defendant's guilt.")).

Tennessee Code Annotated section 39-13-204(c) (2006) provides that

> evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection [39–13–204](i); and any evidence tending to establish or rebut any mitigating factors.

T.C.A. § 39–13–204(c) (2006). The Code further provides for the jury's consideration of "any mitigating circumstances [enumerated in subsection 39-13-204(j)(1)-(8)]" as well as "[a]ny other mitigating factor that is raised by the evidence." *Id*. at § 39-13-204(j)(9). "Residual doubt is an unspecified mitigating factor" provided for in subsection (j)(9). *Kiser*,

284 S.W.3d at 260 n. 36.

Questions concerning the relevancy and thus the admissibility of this evidence rested within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

In this case, the defendant sought introduction of evidence of his acquittal on a federal weapons charge that arose from the facts of this case as evidence of residual doubt of his guilt in this case. The trial court excluded evidence of the acquittal and ruled that an acquittal in a federal weapons offense case did not cast doubt on the defendant's guilt of first degree felony murder. Essentially, the trial court ruled that the acquittal was not probative of residual doubt. We agree and conclude that the trial court did not abuse its discretion by excluding the evidence.

*Conclusion*

Discerning no infirmity in the evidence to support the defendant's convictions or error, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE